IN THE UNITED STATES DISTRICT COURT **F I L E D**
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SEP 1 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

KATHERINE ALBRECHT, )
)
Plaintiff, )
)
v. )  Case No. _03C6472_
)
METROPOLITAN PIER AND )  Judge _Nordberg_
EXPOSITION AUTHORITY, and LETICIA )
PERALTA DAVIS, in her official capacity )
as Chief Executive Officer of the )
Metropolitan Pier and Exposition Authority, )
)
Defendants. )

**DOCKETED**

SEP 1 5 2003

## PLAINTIFF'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER

Plaintiff, by and through her attorneys, pursuant to Rule 65(b) of the Federal

Rules of Civil Procedure, respectfully requests that this Court enter a temporary

restraining order ("TRO") to enjoin the defendants from applying to her proposed

expressive activity their ban on all expressive activity (other than that controlled by the

sponsors of private trade shows and similar events) anywhere inside or outside the

McCormick Place buildings, with the narrow exception of "designated areas" hundreds of

feet away from the facility and far from plaintiff's intended audience.

In support of this Motion, plaintiff states:

1.     The plaintiff has a reasonable likelihood of success on the merits of the

underlying First Amendment claim.



2.      The plaintiff has no adequate remedy at law.  She seeks only declaratory and injunctive relief, and a later damages remedy would not cure the present restriction on her freedom of expression.

3.      The plaintiff will suffer irreparable harm if the TRO is denied.  The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.

4.      The irreparable harm that the plaintiff will suffer if the TRO is not granted is greater than the harm that the defendants will suffer if the TRO is granted.

5.      A TRO will not harm the public interest.  The public has a powerful interest in the vindication of constitutional rights.

6.      In further support of this Motion, the plaintiff submits the attached Memorandum and Exhibits.

WHEREFORE, plaintiff respectfully requests that this Court enter a temporary restraining order that enjoins the defendants:

(1)     from preventing Ms. Albrecht and up to 10 other members of CASPIAN from engaging in the following expressive activities inside the Grand Concourse, in reasonable proximity to the flow of pedestrians to and from the EPC Symposium at Hall B-1:

        (a)     distributing leaflets;

        (b)     wearing clothing that states "Stop RFID" and related political messages; and

        (c)     speaking to people who wish to speak with them about this political matter of significant public importance;

(2) from preventing Ms. Albrecht and up to 5 other members of CASPIAN from engaging in the following expressive activity while viewing the merchandize on display in Hall B-1 in exchange for a $75.00 day pass: wearing clothing that states "Stop RFID" and related political messages; and

(3) from preventing Ms. Albrecht and up to 10 other members of CASPIAN from engaging in the following expressive activities in the outdoor area immediately to the west of the Grand Concourse, within 25 feet from Gate 4:

(a) distributing leaflets;

(b) wearing clothing that states "Stop RFID" and related political messages;

(c) speaking to people who wish to speak with them about this political matter of significant public importance; and

(d) carrying signs that state "Stop RFID" and related political messages.

DATED: September 12, 2003

Respectfully submitted:

_____
One of plaintiffs' attorneys

HARVEY GROSSMAN
ADAM SCHWARTZ
CONNIE CHUNG
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
(312) 201-9740

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

SEP 1 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

KATHERINE ALBRECHT,  )
                   )
    Plaintiff,  )
                   )
    v.  )    Case No. *03 C 6472*
                   )
METROPOLITAN PIER AND  )    Judge *Nordberg*
EXPOSITION AUTHORITY, and LETICIA  )
PERALTA DAVIS, in her official capacity  )
as Chief Executive Officer of the  )
Metropolitan Pier and Exposition Authority,  )
                   )
    Defendants.  )

DOCKETED

SEP 1 5 2003

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## HER MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff Katherine Albrecht seeks a Temporary Restraining Order ("TRO") to enjoin defendants the Metropolitan Pier and Exposition Authority ("MPEA") and its CEO Leticia Peralta Davis from applying to plaintiff's proposed expressive activity defendants' ban on all expressive activity (other than that controlled by the sponsors of private trade shows and similar events) anywhere inside or outside the McCormick Place buildings, with the narrow exception of "designated areas" hundreds of feet away from the facility and far from plaintiff's intended audience. Ms. Albrecht also seeks a TRO to enjoin the application of this ban to her proposed expressive activity.

As set forth below, the relevant law and facts compel the issuance of the TRO.

1



## BACKGROUND

A.    **McCormick Place**

1.    **A Premier Convention Center**

McCormick Place, the nation's premier convention facility, is located near downtown Chicago. (Exh. A)[1] It contains 2.2 million square feet of meeting space, 112 meeting rooms, three theaters, seating for 10,000 people, and receives more than 4,000,000 people every year.

It is a forum where many business, professional, governmental, and religious organizations gather to communicate with each other regarding important economic and political issues. Elected officials and political party leaders frequently participate in functions at McCormick Place, as it is an integral part of the economic and political life of Chicago, the State of Illinois, and the entire nation. Sponsors of events at McCormick Place and the MPEA itself frequently summon the media to McCormick Place in order to disseminate their economic and political views to a larger audience.

Prior to the existence of McCormick Place, events that now take place at the center took place at hotels in the center of downtown Chicago immediately adjacent to streets, sidewalks, and parks that are traditional public forums.

2.    **The Grand Concourse**

McCormick Place contains a Grand Concourse that serves as a thoroughfare, mall and gathering place for persons attending events and meetings involving expressive activities as well as for members of the general public. (Exh. A at 1). The Grand Concourse is open to the public – including to persons with no connection whatsoever to

---

[1] For the convenience of the Court, attached are two different maps of McCormick Place.

2

any of the trade shows, expositions, or other events occurring within McCormick Place –

to freely enter, move about from place to place, and gather and communicate with other

people. It allows for a high volume of pedestrian flow due to its width of at least 50 feet

in many locations and its direct access to the City's transportation grid, including streets,

sidewalks, and the Metra train. (Exh. B). It also contains many restaurants and stores,

most or all of which display commercial advertisements. (Exh. C). Its beautiful

fountains, artwork, and adjacent areas which provide seating for people are used for and

plainly designed as places for the public to stop and relax and to gather with others to

engage in conversation. These areas also provide space outside defined meeting rooms

for discussions relating to the subject of the various organized events. (Exh. B).

People within the Grand Concourse commonly wear clothes that bear a wide

variety of written and other messages. Upon information and belief, during election

seasons, people within the Grand Concourse commonly wear clothes and buttons that

bear explicit political messages.

There are many locations within the Grand Concourse and adjacent to pedestrian

flow that are compatible with a wide scope of expressive activity without infringing upon

any security, safety, traffic flow, or other legitimate governmental interests.

### 3. The park and sidewalks to the west

Immediately to the west of the Grand Concourse are a grassy public park and

adjacent public sidewalks bounded on the west by Martin Luther King Drive, a public

street, and on the north, east and south by a U-shaped driveway fashioned McCormick

Square. This outdoor, non-enclosed area contains sculptures and foliage. It is open to the

public to freely enter and move about from place to place, including to persons with no

3

connection to any of the events occurring within McCormick Place. Hundreds of people can stand in and walk through this area at the same time. The sidewalks and adjacent streets are part of the transportation grid of the City of Chicago.

There are many locations within this park and adjacent sidewalks that are compatible with a wide scope of expressive activity without infringing upon any security, safety, traffic flow, or other legitimate governmental interests.

4. **The five pylons – the "designated" area for expressive activity**

There are five large pylons located at the western edge of the aforementioned park, immediately adjacent to the east side of Martin Luther King Drive. They are there for aesthetic purposes. The pylons are at the farthest possible point within this park— more than 200 feet—away from the main west-facing entrance of the Grand Concourse (*i.e.*, Gate 4). (Exh. D).[2]

The pylons are far from any significant pedestrian flow, both in absolute terms and as a portion of the overall pedestrian flow passing through the Grand Concourse. The overwhelming majority of the people who enter McCormick Place for the purposes of a convention or other gathering will never come anywhere near the pylons. People who arrive by Metra train, who walk over from the adjacent Hyatt Hotel, and who park their cars in the Underground Parking Garage C and Soldier Field Parking Lot will enter the facility from the inside. (Exh. A at 2) People who park their cars in Parking Garage A may enter the facility from the inside by way of a pedestrian walkway. (Exh. A at 2). People who are dropped off by bus, taxi, or other car at Gate 1, Gate 2, Gate 3, the North Building Taxi Drop Off, or either of the Lakeside Taxi Drop Offs will enter the facility at

---

[2] The attached photograph shows 3 of the 5 pylons on the far right and Gate 4 on the far left, directly above the trash can but partially covered by the tree.

points very far from the pylons. (Exh. A at 2). People who are dropped off by bus, taxi, or other car at Gate 4 will be in vehicles which use the circular drive which completely circumvents the designated area; these people will enter the facility at a point at least 200 feet away from the designated pylons. (Exh. A at 2)

Finally, the pylons are themselves massive objects that potentially will block the public's view of expressive activity in this area.

**B.      Ms. Albrecht's planned expressive activity**

**1.      Ms. Albrecht's work with CASPIAN**

Ms. Albrecht and other members of Consumers Against Supermarket Privacy Invasion and Numbering ("CASPIAN") oppose business practices that invade consumer privacy such as the Radio Frequency Identification ("RFID"), which tags and tracks individual consumer products, and the Electronic Product Code ("EPC") network, which uniquely numbers all RFID tagged items and connects them to computer databases via the Internet. (Exh. E at 2). In order to advance their shared political beliefs, CASPIAN members engage in public advocacy regarding their objections to RFID, including communicating with the public to educate them about CASPIAN's concerns regarding individual privacy. (Exh. E at 2).

**2.      The EPC Symposium at McCormick Place**

On September 15 through 17, 2003, the Electronic Product Code ("EPC") Symposium will take place at McCormick Place, at Hall B-1 of Level 3 of the North Building. (Exh. F at 1). The subject of this Symposium is the development of RFID. (Exh. F at 1; Exh. E at 2). The sponsor of the Symposium, Auto-ID Center, is developing RFID with the support of over 100 businesses and government bodies from around the

5

world. (Exh. F at 3). Thousands of key decision-makers in leading organizations have been invited to the EPC Symposium and at least 24 businesses, including major companies like IBM, will be presenting exhibits. (Exh. F at 4 & 6-7).

### 3. The expressive activity

On September 16, 2003, Ms. Albrecht and other members of CASPIAN plan to express their opposition to RFID to persons attending the EPC symposium. (Exh. E at 2.)

First, Ms. Albrecht and no more than 10 other members of CASPIAN would like to stand inside the Grand Concourse, in reasonable proximity to the flow of pedestrians to and from the EPC Symposium, and at that location distribute leaflets, wear clothing that states "Stop RFID" and related political messages, and speak to people who wish to speak with them about this political matter of significant public importance. (Exh. E at 2-3).

Second, Ms. Albrecht and no more than 5 other CASPIAN members plan to purchase a $75.00 day pass to observe the merchandise and informational materials being disseminated on display in Hall B-1, and when doing so wear clothing that states "Stop RFID" and related political messages inside Hall B-1. (Exh. E at 3).

Third, Ms. Albrecht and no more than 10 other members of CASPIAN would like stand immediately to the west of the Grand Concourse, within 25 feet from Gate 4, and at that location distribute leaflets, wear clothing and carry signs that state "Stop RFID" and related political messages, and speak to people who wish to speak with them about this political matter of significant public importance. (Exh. E at 3).

Leafleting and wearing expressive clothing are effective instruments to disseminate information and opinion, and are compatible with large multipurpose forums.

People commonly share leaflets and wear clothes that bear a wide variety of written and other messages, and these activities, conducted responsibly and lawfully, will not impede pedestrian flow.

**C.     The MPEA's policy regarding expressive activity**

On October 1, 2001, the MPEA promulgated a written policy regarding expressive activity at McCormick Place, including but not limited to "literature distribution". (Exh. G at 1). The policy states that all expressive activities "must take place within the designated areas . . . shown on a map attached to the Permit". (Exh. G at 1; Exh. H at 3). The written map attached to the permit states, in relevant part: "Activities related to shows in the North and South Buildings must be held on the sidewalk between the pylons on Martin Luther King Drive". (Exh. G at 4; Exh. H at 4).[3]

On or about August 28, 2003, CASPIAN member Liz McIntyre spoke by telephone with Fred Simon, a supervisor at McCormick Place, who provided to CASPIAN a copy of the aforementioned policy. (Exh. I at 2). Mr. Simon further advised Ms. McIntyre that the wearing of clothing that bears expressive messages would not be permitted within McCormick Place. (Exh. I at 2).

Thus, the MPEA has adopted and enforces a policy of banning all expressive activity (other than that controlled by the sponsors of private events) anywhere inside or outside the McCormick Place buildings, with the narrow exception of "designated areas"

---

[3] On August 29, 2003, Defendants faxed a two-page written procedure to Ms. Albrecht regarding the policy on First Amendment activities at McCormick Place and attached to it a special permit application and a map of designated locations at McCormick Place for First Amendment Staging Activities. (Exh. G). On September 11, 2003, Defendants faxed a letter to Ms. Albrecht's counsel stating the policy on First Amendment activities at McCormick Place and attached to it the same special permit application, a different permit application, and the same map of designated locations at McCormick Place for First Amendment Staging Activities. (Exh. H).

at the pylons, hundreds of feet away from the facility and far from plaintiff's intended audience. (Exh. G; Exh. H).

**D.** **The MPEA's rejection of Ms. Albrecht's expressive activity**

On September 9, 2003, counsel for Ms. Albrecht sent a letter to the MPEA requesting permission for Ms. Albrecht and other CASPIAN members to engage in the following expressive activities: (a) in the Grand Concourse, to distribute leaflets, wear clothing that states "Stop RFID", and engage in public education; and (b) within Hall B-1, to wear clothing that states "Stop RFID". (Exh. J at 1).

On September 11, 2003, counsel for the MPEA sent a letter to counsel for Ms. Albrecht stating that other than private trade shows, expositions, and similar events, "the facility's interior is not otherwise open to the public for free expression". (Exh. H at 1). The letter further stated that the MPEA "restricts public expression on the facility's exterior to the designated areas identified in the permit application". (Exh. H at 1). The MPEA enclosed with this letter a copy of the written policy described above. (Exh. H at 2-5).

Also on September 11, 2003, counsel for Ms. Albrecht spoke by telephone with counsel for the MPEA. When Ms. Albrecht's counsel asked whether the MPEA would allow any members of CASPIAN to engage in expressive activity in the area between Martin Luther King Drive and the U-shaped driveway fashioned McCormick Square, at any place closer to Gate 4 than at the pylons, MPEA's counsel said no.

## DISCUSSION

Ms. Albrecht can satisfy all of the requirements for a TRO: (1) she has a reasonable likelihood of success on the merits of the underlying claim; (2) she has no adequate remedy at law; (3) she will suffer irreparable harm if the TRO is denied; (4) the irreparable harm she will suffer without the TRO is greater than the harm that the defendants will suffer if the TRO is granted; and (5) the TRO will not harm the public interest. See Kiel v. City of Kenosha, 236 F.3d 814, 815-16 (7th Cir. 2000); Ayres v. City of Chicago, 125 F.3d 1010, 1013 (7th Cir. 1997).

## I. LIKELIHOOD OF SUCCESS ON THE MERITS.

Ms. Albrecht seeks to engage in decidedly effective and minimally intrusive forms of expressive activity: distributing leaflets, wearing clothing with political messages, and speaking to willing passersby. These forms of expression are highly protected by the First Amendment. See Part I(A), infra.

Assuming for the sake of argument that the locations where Ms. Albrecht proposes to engage in expressive activity are non-public forums, the defendants' policy is not "reasonable" in light of the nature of these locations. See Part I(B), infra.

Moreover, the grassy park and adjacent sidewalks circled by Martin Luther King Drive and the McCormick Square driveway comprise a traditional public forum, and the defendants' speech restrictions cannot pass muster therein under the "time, place, and manner" test. See Part I(C), infra. The same is true for the area inside the Grand Concourse. See Part I(D), infra.

Finally, the defendants' policy fails First Amendment scrutiny because it does not accommodate multiple viewpoints. See Part I(E), infra.

A.    **Ms. Albrecht's means of communication are highly protected.**

Leafleting on matters of public concern is a "classic form[ ] of speech that lie[s] at

the heart of the First Amendment." Schenck v. Pro-Choice Network, Inc., 519 U.S. 357,

376 (1997). See also McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347 (1995)

("handing out leaflets in the advocacy of a politically controversial viewpoint is the

essence of First Amendment expression . . . . No form of speech is entitled to greater

constitutional protections.").[4]  This is true for several reasons.

First, communication of information and opinions through leafleting is one of the

"most effective instruments in the dissemination of opinion". Schneider V. State of New

Jersey, 308 U.S. 147, 164 (1939).

Second, leafleting is inherently unobtrusive and poses few if any safety or traffic

flow threats.  "[I]t is difficult to point to any problems intrinsic to the act of leafleting that

would make it naturally incompatible with a large, multipurpose forum." International

Society for Krishna Consciousness, Inc. v. Lee ("ISKCON"), 505 U.S. 672, 690 (1992)

(O'Connor, J., concurring); see United States v. Kokinda, 497 U.S. 720, 734 (1990)

("One need not ponder the contents of a leaflet or pamphlet in order mechanically to take

it out of someone's hand."); National Treasury Employees Union v. King, 798 F. Supp.

890, 789 (D.D.C. 1992) ("[P]assing out leaflets may be one of the least disruptive forms

---

[4] Thus, the Supreme Court has repeatedly struck down restrictions on leafleting.
See, e.g., McIntyre, 514 U.S. at 347 (ban on leafleting anonymously); United States v.
Grace, 461 U.S. 171 (1983) (ban on leafleting on sidewalk in front of Supreme Court);
Lovell V. Cityi of Griffin, 303 U.S. 444, 452 (1938) (ban on leafleting without a permit);
see also Organization for a Better Austin v. Keefe, 402 U.S. 415 (1972) (lower court
injunction against leafleting); Talley v. California, 362 U.S. 60, 64 (1960) (ban on
anonymous leafleting); Martin v. City of Struthers, 319 U.S. 141, 145 (1943) (ban on
leafleting door-to-door); Jamison v. Texas, 318 U.S. 413 (1943) (ban on leafleting in
public places); Schneider, 308 U.S. at 164 (ban on leafleting in public places).

of expression."). And unlike large-scale expressive events, such as marches or rallies, leafleting allows multiple parties to simultaneously communicate their views in the same location without disturbing each other. See, e.g., Irish Subcomm. v. Rhode Island Heritage Comm'n, 646 F. Supp. 347, 356 (D.R.I. 1986).

Moreover, leafleting will not impede pedestrian flow at McCormick Place. A leafleter would occupy no more space than any other person walking or standing within or in front of the Grand Concourse, or a one-on-one conversation among two convention participants – activities that defendants of course do not seek to restrict. Leafleting poses no problems greater than a person attending the EPC Convention stopping at a fountain in the General Concourse and saying to another attendee at an ordinary volume, "I'm concerned about the privacy implications of RFID". Leafleting simply cannot be compared to intrusive forms of expressive activity like bullhorns or chanting crowds. See Ward v. Rock Against Racism, 491 U.S. 781, 799 n.7 (1989) (observing that "a ban on handbilling, of course, would suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, [including] . . . traffic congestion"); see also United States v. Fennelly, 726 F. Supp. 871, 874 (D.D.C. 1989) (holding leafleting regulation unconstitutional, in part, because no difference existed between leafleting and speaking and there was no allegation that speaking posed security concerns).

Like leafleting, wearing an item of clothing with a written or other message is an effective means to disseminate information and opinions, and it that does not burden any legitimate governmental interests. The same is true of two people engaging in consensual, face-to-face conversation. Indeed, the defendants tolerate these two expressive activities inside and outside the McCormick Place buildings every day of the

11

year – unless, apparently, such expressive activity is not sanctioned and may therefore be in opposition to a group that has rented one of the rooms.

**B.** **Ms. Albrecht's means of communication are allowed in any forum.**

In this section, Ms. Albrecht will assume for the sake of argument that all of the locations where she wants to engage in expressive activity (the inside of the Grand Concourse, the inside of Hall B-1, and the outside area within 25 feet of the Grand Concourse) are non-public forums. (Ms. Albrecht contests this assumption in Part I(C) and Part I(D), below.)

In a non-public forum, restrictions on speech are valid only if they are "reasonable". Perry Educ. Assoc. v. Perry Local Educators' Assoc., 460 U.S. 37, 46 (1983). Whether a speech restriction in a non-public forum is "reasonable" is a highly fact-intensive inquiry that requires an exploration of "the purpose of the forum and all the surrounding circumstances", Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 809 (1985), and also "the characteristic nature and function of the particular forum involved" including any "special attributes", United States v. Kokinda, 497 U.S. 720, 732 (1990).

Thus, in her controlling concurrence opinion in ISKCON, Justice O'Connor held that the First Amendment protected the disputed expressive activity (leafleting) in the disputed non-public forum (an airport). 505 U.S. at 690. Justice O'Connor explained:

> In this case, the "special attributes" and "surrounding circumstances" of the airports operated by the Port Authority are determinative. Not only has the Port Authority chosen *not to* limit access to the airports under its control, it has created a huge complex open to travelers and nontravelers alike. The airports house restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, post offices, banks, telegraph offices, clothing shops, drug stores, food stores, nurseries, barber shops, currency exchanges, art exhibits, commercial advertising displays, bookstores, newsstands, dental offices, and private clubs.

Id. at 688. Significantly, Justice O'Connor held that "[t]he reasonableness inquiry" turned not on whether the ban on leafleting was consistent with air travel, but whether the ban was "reasonably related to maintaining the multipurpose environment that the Port Authority has deliberately created". Id. at 689.

The leading Seventh Circuit decision interpreting ISKCON is Chicago ACORN v. MPEA, 150 F.3d 695, 703 (7th Cir. 1998). There, Judge Posner explained: "What is particularly interesting about Justice O'Connor's swing opinion [in ISKCON] is that it blurs the line between the public and nonpublic forum, suggesting a sliding-scale approach . . . in which the benefits and costs of free speech are balanced in particular settings".

Significantly, in ACORN, applying this "reasonableness" standard to non-public forums, the Seventh Circuit struck down the very speech restrictions defendant here seek to enforce. 150 F.3d at 702-04 (holding that the First Amendment protects leafleting and wearing clothing that bears political messages in the outdoor sidewalks and "indoor mall areas" at the MPEA's Navy Pier); see also ISKCON, 505 U.S. at 690 (1992) (O'Connor, J., concurring) (striking down a ban on leafleting at airports); Board of Airport Commrs. of Los Angeles v. Jews for Jesus, 482 U.S. 569, 575 (1987) (unanimously striking down a ban on "all First Amendment activity" at an airport because "no conceivable governmental interest would justify such an absolute prohibition of speech").

In light of the foregoing legal principles, all of Ms. Albrecht's proposed expressive activities are "reasonable" within the various units of McCormick Place where she proposes to engage in them.

First, the area inside the Grand Concourse is fully compatible with 10 people who leaflet, wear clothes that bear political messages, and converse with willing passersby. The Grand Concourse serves as a thoroughfare, mall and gathering place for members of the public, including people with no connection whatsoever to any event taking place at McCormick Place. The Grand Concourse allows for a high volume of pedestrian flow due to its great width and its direct access to the City's transportation grid, including streets, sidewalks, and the Metra train. It also contains many restaurants and stores, most or all of which display commercial advertisements. Its beautiful fountains and adjacent areas are used and plainly designed as places for the public to stop and relax and engage in conversation. People within the Grand Concourse commonly wear clothes that bear a wide variety of written and other messages, including political messages during election seasons.

Second, the park and sidewalk areas 25 feet outside the Grand Concourse are fully compatible with 10 people engaged in the foregoing activities, and also holding signs that bear political messages. This area is open to the public to freely enter and move about from place to place, including to persons with no connection to a facility event. Hundreds of people can stand in and walk through this area at the same time. The sidewalks and adjacent streets are part of the transportation grid of the City of Chicago.

Third, the area inside Hall B-1 is fully compatible with 5 people wearing clothes that bear political messages. These persons plan on doing nothing but looking at merchandize in exchange for a $75.00 day pass, and simultaneously wearing message-bearing clothing. This expressive activity will not burden any legitimate governmental interest. Other paying attendees are free to tell other people their views about products

14

and the RFID in particular, and there is no legitimate reason not to allow plaintiff to do so through her T-shirt message.

The "special attributes" and "surrounding circumstances" of McCormick Place as a whole further support the conclusion that the challenged speech restrictions are not reasonable in any of the three locations just discussed. McCormick Place is a forum where many business, professional, governmental, and religious organizations gather to communicate with each other regarding important economic and political issues. It receives more than 4,000,000 visitors every year. Elected officials and political party leaders frequently participate in functions at McCormick Place.

The specific facts in this case are highly similar to the specific facts in ISKCON, where the government opened the forum "to travelers and nontravelers alike", and also purposefully included within the forum a plethora of businesses, commercial advertising, and places to stop and relax. 505 U.S. at 688. Likewise, the specific facts involving the MPEA's McCormick Place Grand Concourse are highly similar to the specific facts in Chicago ACORN involving the MPEA's Navy Pier indoor malls. 150 F.3d at 702-04.

Finally, when the government asserts a particular interest to justify restrictions on speech, its justification must be discounted if the government condones other conduct that poses the same threat to that interest. See Florida Star v. B.J.F., 491 U.S. 524, 540 (1989) (expressing "serious doubts about whether [the government] is, in fact, serving . . . the significant interests which [it] invoke[d]" when it had failed to regulate a substantial part of the activity giving rise to the alleged harm); City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 425 (1993) (holding that a regulation banning commercial but not noncommercial newsracks was an "impermissible means of responding to the

city's admittedly legitimate interest" in safety and esthetics of its streets). See also

Sanjour v. E.P.A., 56 F.3d 85, 95 (D.C. Cir. 1995) ("Because the government has thus

not even attempted to regulate a broad category of behavior . . . giving rise to precisely

the harm that supposedly motivated it to adopt the regulations, we have trouble taking the

government's avowed interest to heart.").

Here, the defendants sponsor certain written messages inside McCormick Place

(commercial advertisements for Grand Concourse restaurants and stores) while

simultaneously prohibiting other written messages (political statements on clothing and

leaflets). The defendants' sponsorship of the former undermines their claim that the latter

threatens their legitimate interests.

**C.**     **The speech restrictions at the park fail.**

The grassy park and adjacent sidewalks circled by Martin Luther King Drive and

the McCormick Square driveway comprise a traditional public forum, and the

defendants' policy as applied therein cannot pass muster under the "time, place, and

manner" test.

**1.**     **The park is a traditional public forum.**

Traditional public forums are those "which by long tradition or by government

fiat have been devoted to assembly and debate." Perry Educ. Ass'n v. Perry Local

Educators' Ass'n, 460 U.S. 37, 45-46 (1983). Streets, sidewalks, and parks are the

archetype of traditional public forums. See, e.g., United States v. Grace, 461 U.S. 171,

179 (1983) (holding that sidewalks "are clearly within those areas of public property that

may be considered, generally without further inquiry, to be public forum property").[5] Likewise, forums that combine the attributes of both sidewalks and parks are traditional public forums. See, e.g., Warren v. Fairfax County, 196 F.3d 186, 189-90 (4th Cir. 1999) (holding that the "Center Island mall is a traditional public forum because it is merely a combination of the . . . prototypical examples of traditional public forums").

Here, the grassy park and adjacent sidewalks encircled by Martin Luther King Drive and the McCormick Square driveway comprise a traditional public forum. They are a large, unobstructed, outdoor space that includes sculptures and foliage areas. This area is "eminently compatible with the widest scope of expressive activity." Warren, 196 F.3d at 195.

Another factor indicating that this space is a traditional public forum is the absence of any identifiable demarcation between the sidewalk running north-to-south along Martin Luther King Drive and the sidewalk running east-to-west from the pylons to the Grand Concourse. Courts have repeatedly found such a characteristic to be indicative of a traditional public forum. See Brister v. Faulkner, 214 F.3d 675 (5th Cir. 2000); Grace, 461 U.S. at 180; Venetian Casino Resort , L.L.C. v. Local Joint Exec. Bd. of Las Vegas, 257 F.3d 937, 945 (9th Cir. 2001).

---

[5] See also Perry, 460 U.S. at 45 (holding that streets and parks are the "quintessential" traditional public forums); Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir. 1999) ("Since it is so likely that any given street, sidewalk, or park meets all three characteristics of a traditional public forum, a court can generally treat a street, sidewalk, or park as a traditional public forum without making a 'particularized inquiry.'"); International Union of Operating Eng'r, Local 150, AFL-CIO v. Village of Orland Park, 139 F. Supp. 2d 950, 958 (N.D. Ill. 2001) ("Streets and parks are traditional public forums."); Ayres v. City of Chicago, 966 F. Supp. 701, 711-12 (N.D. Ill. 1997) (holding that Grant Park is a traditional public forum);

2.      **The restriction fails the "time place, and manner" test.**

Restrictions on expressive activity in a traditional public forum are analyzed

under the "time, place, and manner" test. Here, the restriction cannot stand, because (1) it

is not "narrowly tailored to a serve a significant government interest," and (2) it does not

"leave open ample alternative channels for communicating the information." Ward v.

Rock Against Racism, 491 U.S. 781, 791 (1989).

a.      **The restriction is not narrowly tailored.**

In a traditional public forum, the government must accommodate the greatest

amount of expressive activity consistent with their other competing obligations. A

regulation is only narrowly tailored "if it targets and eliminates no more than the exact

source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1988). It

is invalid if it "burden[s] substantially more speech than is necessary to further the

government's legitimate interests." Ward, 491 U.S. at 799. As a result: "Broad

prophylactic rules in the area of free expression are suspect. Precision of regulation must

be the touchstone in an area so closely touching our most precious freedoms." Edenfield

v. Fane, 507 U.S. 761, 777 (1993). The government "must do more than simply 'posit

the existence of the disease sought to be cured.' It must demonstrate that the recited

harms are real, not merely conjectural, and that the regulation will in fact alleviate these

harms in a direct and material way." Turner Broad. Sys. V. F.C.C., 512 U.S. 622, 624

(1944) (internal citations omitted).

Here, the defendants have banned all expressive activity within this grassy park

and the adjacent sidewalks, with the narrow exception of an inadequate "designated area"

next to the five pylons. As applied to Ms. Albrecht's proposed expressive activities

18

(leafleting, displaying messages on clothing and signs, and speaking to willing passersby), this policy is not narrowly tailored. It is a broad, prophylactic rule that burdens substantially more speech than is necessary to protect any legitimate governmental interest.

The MPEA's sole support to date for its speech restriction is the generalized claim that it is necessary to protect "safety, traffic flow and other management objectives". (Exh. H at 1) This naked assertion cannot sustain the defendants' heavy burden of demonstrating constitutional compliance. See, e.g., U.S. v. Playboy Ent. Group, Inc., 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); U.S. v. National Treasury Emp. Union, 513 U.S. 454, 475 (1995) ("Fear of serious injury cannot alone justify suppression of free speech and assembly."); Turner Broad. Sys. v. F.C.C., 512 U.S. 622, 624 (1994) (plurality opinion) (explaining that government "must demonstrate that recited harms are real, not conjectural, and that regulation will in fact alleviate these harms in a direct material way").

### b.      The restriction do not provide alternative channels.

The "designated area" by the five pylons is not an "ample alternative channel" for Ms. Albrecht to communicate her information. Ward, 491 U.S. at 791. As the Supreme Court has explained, "[t]he First Amendment protects [speakers'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." Meyer v. Grant, 486 U.S. 414, 424 (1988). Moreover, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it

may be exercised in some other place." Schneider v. Town of Irvington, 308 U.S. 147, 163 (1939).

Here, Ms. Albrecht's intended audience is persons gathered at McCormick Place to participate in a convention. The only effective means of communication with this audience is to be in reasonably close physical proximity, so that convention attendees can see what is written on her T-shirt or sign, or (if they wish) to take a leaflet from or speak with her.

The "designated area" next to the five pylons is not an adequate alternative channel of communication. The pylons are at the farthest possible point within this park away from the main entrance to the Grand Concourse. They are far from any significant pedestrian flow, both in absolute terms and as a portion of the overall pedestrian flow passing through the Grand Concourse. Indeed, the overwhelming majority of the people who enter McCormick Place for the purposes of a convention will never come anywhere near the pylons: some will never step out-of-doors; others will enter the facility from points very far away from the pylons; and still others will be dropped by bus or car directly in front of Gate G-4, at a distance of at least 200 feet from the pylons.

**D.**     **The restrictions at the Concourse fail.**

The interior of the Grand Concourse is a traditional public forum, and the defendants' policy as applied therein cannot pass muster under the "time, place, and manner" test.

Ms. Albrecht herein incorporates by reference her argument regarding the status of the grassy park as a traditional public forum. She adds that the Grand Concourse is a traditional public forum because it serves as a thoroughfare, mall and gathering place for

members of the public, including people with no connection whatsoever to any event taking place at McCormick Place. The Grand Concourse allows for a high volume of pedestrian flow due to its width of at least 50 feet in many locations and its direct access to the City's transportation grid, including streets, sidewalks, and the Metra train. It also contains many restaurants and stores, most or all of which display commercial advertisements. Its beautiful fountains and adjacent areas are used and plainly designed as places for the public to stop and relax. People within the Grand Concourse commonly wear clothes that bear a wide variety of written and other messages, including political messages during election seasons.

Also, Ms. Albrecht herein incorporates by reference her argument that the defendant's policy cannot pass muster under "the time, phrase, and manner" test as applied to the grassy park. She adds that in the Grand Concourse there is an absolute ban on expressive activity. Significantly, "an outright ban on expressive activity within a traditional public forum is almost by definition not narrowly tailored." Lederman v. United States, 89 F. Supp. 2d 29, 39 (D. D.C. 2000); see also id. at 41 ("[B]lanket prohibitions have consistently been struck down as burdening substantially more speech than necessary to achieve their ends."). Accord Perry Educational Assn v. Perry Local Educators' Assn, 460 U.S. 37, 45 (1983) (in traditional public forums, "the government may not prohibit all communicative activity"). See, e.g., Loper v. New York City Police Dept., 999 F.2d 699, 705 (2nd Cir. 1993) (striking down ban on begging in public places throughout city "because of the total prohibition it command[ed]"); Jews for Jesus, Inc. v. Bd. of Airport Comm'rs of the City of Los Angeles, 785 F.2d 791, 795 (9th Cir. 1986) (striking down ban on "all First Amendment activity" in central terminal area of airport).

**E.    The MPEA's policy fails to accommodate multiple viewpoints.**

Every time the defendants host a convention, they allow the organization renting

the space to engage in an unlimited amount of expressive activity, while simultaneously

banning any opponents of the renting organization from engaging in any expressive

activity, with the exception of the inadequate "designated areas" next to the five pylons.

But the First Amendment is "premised on the assumption that the widest possible

dissemination of information from diverse and antagonistic sources is essential to the

public welfare." Associated Press v. United States, 326 U.S. 1, 20 (1945). Accordingly,

the government may not permit speech that expresses one viewpoint while restricting

speech that expresses a different viewpoint. See, e.g., Forsyth County v. National

Movement, 505 U.S. 123, 134-35 (1992). This means that the expression of opposing

viewpoints must be accommodated—even when doing so runs the risk of an adverse

reaction. See id. at 134-36 ("Speech cannot be . . . burdened, any more than it can be

punished or banned, simply because it might offend a hostile mob."); Glasson v. City of

Louisville, 518 F.2d 899, 905 (6th Cir. 1975) (The First Amendment "protect[s] the

expression of unpopular ideas as well as popular ideas [and] hostile public reaction does

not cause forfeiture of constitutional protection afforded a speaker's message."). See,

e.g., Mahoney v. Babbitt, 113 F.3d 219, 220 (D.C. Cir. 1997)(requiring that government

allow individuals to demonstrate against presidential policies during inaugural address

parade); Glasson v. City of Louisville, 518 F.2d 899, 901-02, 905 (6th Cir. 1975)

(determining that government was required to allow expression of views protesting U.S.

policies during a presidential procession).

## II.   THERE IS NO ADEQUATE REMEDY AT LAW.

Ms. Albrecht has no adequate remedy at law. She seeks only temporary injunctive relief, and a later damages remedy would not cure the imminent infringement on her freedom of expression. *See* Brownsburg Area Patrons Affecting Change v. Baldwin, 137 F.3d 503, 507 (7th Cir. 1998). No damages could adequately compensate Ms. Albrecht for the lost opportunity to effectively communicate her views regarding RFID to the participants in the EPS Symposium.

## III.  IRREPARABLE HARM.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); National People's Action v. Village of Wilmette, 914 F.2d 1008 (7th Cir. 1990).

Here, in the absence of a TRO, Ms. Albrecht would miss a unique and irreplaceable opportunity to communicate with a large group of individuals who are interested in RFID, in order to warn them of the dangerous privacy implications of the product. This is a crucial symposium regarding EPC, as it will launch the platform for this product. The Symposium sponsor invited thousands of key decision-makers in leading organizations to the Symposium. See Ayres v. City of Chicago, 125 F.3d 1010, 1014 (7th Cir. 1997) (finding great harm to the plaintiff from the denial of the right to disseminate a message before "an enormous potential audience"). Moreover, many of the people at the symposium will be attending because they are curious about the new project, but may have little knowledge about it.

Additionally, the current political and social climate is ripe for such a discussion. The public is increasingly aware of rapid technological developments that may have

23

ramifications regarding privacy and other public policy issues. Thus, the conference participants themselves may be more interested than at any prior time in hearing CASPIAN's message.

**IV.     THE BALANCE OF THE HARDSHIPS.**

The irreparable harm that the plaintiff will suffer if the TRO is not granted is greater than the harm that the defendants will suffer if the TRO is granted. As set forth above, the hardship to Ms. Albrecht would be substantial and irreparable.

On the other hand, the hardship to the defendants would be minimal. The issuance of injunctive relief would require defendants to allow the expressive activities discussed herein (leafleting, wearing shirts with political messages, and speaking to persons walking by) within the Grand Concourse and 25 feet outside of the Grand Concourse. These expressive activities would not burden the defendants' legitimate governmental interests.

To the extent that there is some hypothetical tipping point at which a large number of people engaging in these kinds of expressive activities would burden the defendants' legitimate interests, defendants can avoid that possibility through an appropriate permitting system that limits the number of simultaneous users to the facility's sizeable carrying capacity.

**V.     THE PUBLIC INTEREST.**

The public has a powerful interest in the vindication of constitutional rights. O'Brien v. Town of Caledonia, 748 F.2d 403, 408 (7th Cir. 1984); United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth., 163 F.3d 341, 363-64 (6th Cir. 1998).

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that this Court enter a temporary restraining order that enjoins the defendants:

(1)     from preventing Ms. Albrecht and no more than 10 other members of CASPIAN from engaging in the following expressive activities inside the Grand Concourse, in reasonable proximity to the flow of pedestrians to and from the EPC Symposium at Hall B-1:

(a)     distributing leaflets;

(b)     wearing clothing that states "Stop RFID" and related political messages; and

(c)     speaking to people who wish to speak with them about this political matter of significant public importance;

(2)     from preventing Ms. Albrecht and no more than 5 other members of CASPIAN from engaging in the following expressive activity while viewing the merchandize on display in Hall B-1 in exchange for a $75.00 day pass: wearing clothing that states "Stop RFIC" and related political messages; and

(3)     from preventing Ms. Albrecht and no more than 10 other members of CASPIAN from engaging in the following expressive activities in the outdoors area immediately to the west of the Grand Concourse, within 25 feet from Gate 4:

(a)     distributing of leaflets;

(b)     wearing clothing that states "Stop RFID" and related political messages;

(c)     speaking to people who wish to speak with them about this

political matter of significant public importance; and

(d)     carrying signs that state "Stop RFID" and related political

messages.

DATED:  September 12, 2003

Respectfully submitted:

One of plaintiffs' attorneys

HARVEY GROSSMAN
ADAM SCHWARTZ
CONNIE CHUNG
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
(312) 201-9740

26