IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

SEP 1 5 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| KATHERINE ALBRECHT, | ) |
| | ) |
| plaintiff, | ) |
| | ) |
| v. | ) No. 03 C 6472 |
| | ) |
| | ) Hon. Judge Nordberg |
| METROPOLITAN PIER AND | ) |
| EXPOSITION AUTHORITY and | ) Magistrate Judge Denlow |
| LETICIA PERALTA DAVIS, in her | ) |
| official capacity as CEO of the MPEA, | ) |
| | ) |
| defendants. | ) |

FILED

SEP 1 5 2003

JUDGE JOHN A. NORDBERG
UNITED STATES DISTRICT COURT

SEP 1 6 2003

## THE AUTHORITY'S VERIFIED MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Metropolitan Pier and Exposition Authority (the "Authority") owns and operates McCormick

Place, one of the largest and most successful convention facilities in the world. Leticia Peralta-Davis

is the Authority's Chief Executive Officer, sued only in her official capacity. Defendants oppose the

motion for a temporary restraining order ("TRO") that would allow plaintiff and others to engage

in protest activities in and around McCormick Place. McCormick Place is a publicly-owned facility

that seeks to promote economic development in Illinois. It was established by the Illinois legislature

for the sole purpose of attracting and hosting large-scale conventions and trade shows in Chicago.

McCormick Place is estimated to have generated upwards of $4 billion of local spending last year,

which translates to significant revenue for local businesses and government alike. But this business

is highly competitive. The Authority must compete every year with other large facilities around the

country to persuade major conventions and trade shows to return to Chicago, and to attract new ones.

These simple, uncontested facts dictate a simple, swift resolution of plaintiff's motion for a TRO. Under First Amendment law, McCormick Place is a "non public forum." As such, speech restrictions inside the facility and on its grounds need only be reasonable, consistent with McCormick Place's intended purpose. The Authority prohibits protesting, leafleting and other such activity in the interior of McCormick Place because, quite simply, that is not what its customers want or expect to see when they spend, in the aggregate, millions of dollars to host and attend major trade shows. The Authority is also properly concerned with safety and security: in a facility at times packed with tens of thousands of visitors, even a few protestors bent on creating fear and disruption could create a major public safety issue. If customers cannot conduct business inside McCormick Place in a private and secure environment, they will take their business elsewhere, to other facilities in other cities that are not subject to interior picketing, leafleting or other such disruptions. Such activity inside McCormick Place is inimical to running a successful convention facility.

The Authority of course recognizes that it is a public entity, and must observe constitutional requirements that do not bind a private business. Consistent with this responsibility, the Authority has designated two large, highly visible free speech areas outside McCormick Place. Pertinent to the motion for TRO, one of these is in front of McCormick Place's main entrance, outside the interior concourse where plaintiffs seek to protest tomorrow. This area is huge: approximately 150 feet long and 30 feet deep. It can accommodate scores of protestors. It is clearly visible to anyone arriving at the main entrance or the nearby Hyatt Hotel. Anyone who parks in McCormick Place's large main parking garage must walk past this area to reach the main entrance. The area also abuts Martin Luther King Drive, a major thoroughfare, and is clearly visible to the considerable traffic that passes by. It occupies, in essence, McCormick Place's front yard, spanning the entire western

2

facade. This area is a more than reasonable accommodation of free speech interests at McCormick Place, and is legal grounds without more for denying the TRO on its face.

A second problem with the request for a TRO is that plaintiff waited too long to seek relief. Plaintiff and like-minded persons wish to protest a symposium on supermarket product coding technology scheduled for September 16, 2003. This event has been scheduled at least since January 2003, and yet plaintiff's group waited until late August to contact the Authority about a protest. Inexplicably, plaintiff waited even longer, until late Friday, September 12, to file suit. McCormick Place's policy on public expression is no secret in any event. Plaintiff and her counsel at the ACLU easily could have challenged this policy months ago, instead of waiting until two business days before their planned protest. This inexcusable delay, without more, defeats the motion for TRO.

Finally, the balance of harms tips in the Authority's favor. Without relief, plaintiff and her group still have available a large, publicly visible area where they can protest on September 16 in view of persons arriving at McCormick Place and the Hyatt and passers-by on King Drive. For the Authority, however, September 16 is an extremely busy day, with four major shows and a projected 40,000 visitors. Concerns about safety, crowd movement and traffic congestion are at their height. From an operations point of view, plaintiffs have targeted a date when it is particularly unacceptable to experiment with the Authority's existing policy, based on essentially no evidence, and hope that no disruption ensues. Under these circumstances, there is no reason or justification for entertaining a purported emergency challenge to the Authority's settled policy of restricting public expression to two large zones outside McCormick Place's main entrances. The motion for a TRO should be seen for what it is: an effort to *avoid* the merits by giving the Authority no time to respond, and the Court no time to consider the facts and the law. The motion for a TRO should be denied.

3

## BACKGROUND

The Authority is a limited purpose governmental entity established by the Metropolitan Pier and Exposition Authority Act, 70 ILCS § 210/1 et seq. Its statutory purpose is to develop and operate facilities for conventions, trade shows, meetings and exhibitions as well as commercial, cultural and recreational activities. It currently operates two such facilities: McCormick Place and Navy Pier. In operating these facilities, the Authority's goals are to create desirable venues that successfully compete in the international market for conventions, trade shows and exhibitions, and to generate economic activity with consequent jobs and business opportunities for State residents.

*McCormick Place: Facilities and Layout.* Of the Authority's two facilities, McCormick Place is much larger and more business-oriented than Navy Pier. Navy Pier has meeting rooms and exhibition spaces, but its main function is as a family-oriented tourist destination. Thus, it has the Children's Museum, an I-Max theater, the Shakespeare Theater, the Skyline stage, a Ferris wheel, and many other recreational activities. This is known in the trade as a "business-to-consumer" facility. In contrast, McCormick Place is a "business-to-business" facility. Its main purpose is to attract and host major trade shows, conventions and exhibitions. To that end, it has roughly 2.2 million square feet of exhibition space, 112 meeting rooms and three auditoriums, spread across three major areas: the North Building, South Building and Lakeside Center. Mobley Ex. 1-2.

The facility's main axis is the Grand Concourse, a spacious three-story interior walkway. Ex. 2 (upper left); Ex. 4. It runs east-west, perpendicular to the North and South Buildings, which are large, multi-level exhibition halls that abut either side of the concourse. Ex. 3 (map). Towards the eastern end of the Grand Concourse, the walkway becomes an interior pedestrian bridge across Lakeshore Drive, thus connecting the North and South Buildings to Lakeside Center. When no

4

major shows are taking place, or when attendees are engaged at events inside the exhibition halls, the Grand Concourse can be a serene, open and quiet space with minimal pedestrian traffic. But during major exhibitions, it becomes crowded nearly elbow to elbow with thousands of visitors.

On the western end of the Grand Concourse is McCormick Place's main entrance, known as Gate 4. Ex. 1. As one faces Gate 4 from Martin Luther King Drive, the Hyatt Regency Hotel rises to the left, connected to the Grand Concourse by an interior walkway. Ex. 15. The immense South Building lies to the right of Gate 4. Ex. 6. This structure is where the largest exhibitions typically occur. An interior access road to the right of Gate 4 runs inside the South Building to Gates 1-3, where large tour buses drop off conference attendees. The area outside Gate 4 and the Hyatt is called McCormick Square. Ex.3, 6, 10-15. It is McCormick Place's main hub. Throughout major shows, hundreds of taxis, limousines, charter shuttle buses and vans drive around McCormick Square to drop off thousands of passengers at Gates 1-4 or the Hyatt. The western side of the square is King Drive, a heavily trafficked artery that connects Chicago's near South Side to Michigan Avenue and the Loop. Ex. 3, 10, 12. Most visitors to McCormick Place arrive through McCormick Square.

McCormick Square itself is a landscaped space with grass, trees, planters, flagstones and bisecting walkways. The western side of the square along King Drive contains five vertical pylons, six-story decorative structures shaped somewhat like the wings of an airplane. Ex. 6, 10, 12-13. The Authority has designated this entire area for free speech activities at McCormick Place. The zone runs the entire length of the western side of McCormick Square. It is approximately 150 feet long and 30 feet deep. Needless to say, it is highly visible to traffic on King Drive and persons entering and exiting McCormick Square. This area is big enough to accommodate large, even noisy crowds of protestors in full view of the hotel, the main entrance and passers-by, and yet without disruption

5

to private events inside McCormick Place. Ex. 3. Immediately across King Drive is a six-story public parking structure, one of the largest at McCormick Place, and a conference center owned by the Authority and operated by the Hyatt Hotel. Ex. 3, 14. A wide walkway leads from this parking garage and conference center to Gate 4, running straight through the free speech zone. Ex. 11, 13-15. Thus, in addition to their high public visibility, protestors may leaflet and talk to persons who park in the main garage and walk to Gate 4 and the Grand Concourse. On the cover of its promotional brochure, the Authority uses a photograph of the main entrance to McCormick Place taken from the free speech area. Ex. 1. This area has been agreeable to past demonstrators because it provides an excellent photo-shoot in front of McCormick Place's recognizable facade.[1/]

*McCormick Place: The Business of Hosting Private Trade Shows and Exhibitions.* Although McCormick Place is a publicly-owned facility, the Authority's purpose is to license that facility to private groups. When an event comes to McCormick Place, such as the Auto Show, the National Restaurant Show or the Hardware Show, the Authority enters into a license agreement with a "Show Manager." The Show Manager books exhibition space or rooms for a period of time sufficient to accommodate the show's objectives. Once the Show Manager has signed a license agreement, it is the Show Manager (not the Authority) who controls access to the licensed area at McCormick Place. The Show Manager decides who gets invited, who is allowed to attend, what the terms and costs of access are, and whether an event is open to the public or by invitation only. The vast majority of events at McCormick Place are private, business-to-business events with closed registration limited

---

[1/]    The Authority has designated a second free speech zone for events at Lakeside Center, east of Lakeshore Drive (see Ex.9). Since plaintiff wishes to protest an event in the North Building, this eastern zone is not directly at issue, although it demonstrates the Authority's commitment to provide a forum for free speech outside both major parts of its McCormick Place facility.

6

to a particular trade or field. As the proprietor of McCormick Place, the Authority retains rights of emergency, security and maintenance access to its entire facility at all times – but apart from this, the Authority's role is strictly to license its facility to private enterprises and stand aside.

The private businesses and trade groups that have chosen to organize shows and exhibitions under contract with McCormick Place have done so because the Authority runs the largest, most flexible, convenient and professionally-managed convention facility in the country. To the extent McCormick Place becomes less convenient, more expensive, or more subject to disruption than comparable facilities, however, the Authority's hard-earned customer base of major trade shows and exhibitions is free to take their business elsewhere. The market for trade shows and conventions is highly competitive. The Authority's professional judgment is that McCormick Place's customers prefer to conduct business in an environment where they are not confronted by persons who disagree with their agenda. The aggregate costs of putting on and attending a major trade show or convention run into millions of dollars, and customers do not spend these sums to gather in a facility that is open to disruption by interior protestors and leafleters. The Authority's customers are not subject to leafleting in the hallways outside their own conference rooms in private office buildings; they are not subject to leafleting inside private hotels, where conferences were held historically; and they expect no less for their money from McCormick Place.

A second but equally important aspect of McCormick Place's management mission is public safety and security. By their very nature, events at this facility draw large numbers of people, sometimes running into the tens of thousands, into a compressed interior space with limited exits. Thus, the Authority's security personnel are extremely sensitive to disruptions that could cause a crowd to panic. In the Authority's judgment, even small numbers of demonstrators or leafleters

7

inside the facility create a risk of conflict and disruption. Persons with a strongly-held point of view may be prone, or at least willing, to confront those with whom they disagree. McCormick Place's physical characteristics and volume of users during busy events are similar to conditions in an office skyscraper or a mall on Michigan Avenue. In such venues, potentially heated dialogue poses a threat to visitors' safety, and it belongs outside. For this reason as well, the Authority limits expressive activity to large zones outside its facility.[2]  The inside is dedicated to the Authority's customers.

*McCormick Place on September 16, 2003.*  Plaintiff seeks to protest and leaflet in interior and exterior areas of McCormick Place tomorrow, on Tuesday, September 16, 2003. As it happens, this is expected to be an extremely busy day at McCormick Place. First, it is the final day of the three-day "Interscience Conference on Antimicrobial Agents and Chemotherapy" (ICCAC). This is considered the preeminent infectious disease meeting in the world, with attendance of approximately 14,000. The ICCAC attendees will be leaving McCormick Place on Tuesday.

Another large shows is *starting* tomorrow, when the South Building will host "The Motivation Show" with expected attendance of 22,000. This is a very busy show attended by travel agents, incentive marketers and other travel professionals. It focuses on marketing destinations and products for business travelers. Because of this show's focus on business travel, cities that compete with Chicago in the conventions market will be in attendance. They will be in a position to compare and contrast how Chicago's facility holds up against their own. Likewise, media outlets who cover

---

[2]  The Authority wishes to make clear that it has no policy banning persons from wearing expressive t-shirts, buttons and the like, or from engaging in conversation with other visitors at McCormick Place. To the extent plaintiff heard otherwise, she misunderstood or was misinformed. However, for most private events at McCormick Place it is the show managers that control access. They are free to impose limits on attendance as they see fit, including dress codes (but not, of course, illegal limits that would constitute discrimination or a similar violation of law).

8

the travel and convention industry will be in attendance. Quite simply, a protest *inside* McCormick Place during this show would likely generate a major "negative story" in the convention industry press, and would hurt Chicago's competitive position and reputation in the industry.

The North Building's events for tomorrow include "Frontline Solutions," with expected attendance of 5,000, and "Promotions Midwest," with expected attendance of 3,000. Frontline focuses on executives and information technology operators who work in the inventory control and supply chain business sector. Promotions Midwest is aimed at professionals looking for promotional products for their business. The North Building is also hosting the event plaintiffs wish to protest, called the Electronic Product Code ("EPC") Symposium. Its expected attendance is around 1,000. This event was booked sometime in the spring of 2003. The manager of the EPC Symposium told McCormick Place that the event has been heavily advertised and promoted by direct mail brochure (Ex. 16-22) and the internet at least since April 2003. The brochure invites persons to register and attend on September 15-17. Thus, the topic and date for the "EPC Symposium" that plaintiff wishes to protest has been a matter of public record for several months.

## ARGUMENT

The standards for granting or denying preliminary relief are well-known: the Court must first determine whether the moving party has demonstrated a "likelihood of prevailing on the merits and an inadequate remedy at law or irreparable harm." *Grossbaum v. Indianapolis-Marion County Building Authority*, 100 F.3d 1287, 1291 (7th Cir. 1996). If the movant demonstrates both, the Court must balance the harm to the non-movant if relief is granted against the harm to the movant if relief is denied, and also consider the public interest and the effect relief will have on non-parties. *Id.* Here, all factors point to denying plaintiff a TRO. Plaintiff has no probability of success on the

9

merits – principally because McCormick Place is a non-public forum, and because the Authority's ample accommodation of speech interests far exceeds the case law's minimal "reasonable" standard. A TRO is also barred by plaintiff's own delay: since she manufactured the emergency, she cannot be granted relief, especially when she has been offered and refused a large and ample protest site. Even if the Court balances the harms and considers the public interest, the potential disruption to McCormick Place and its customers on a peak visitor day far exceeds the minimal burden on plaintiff of protesting outside. There are no grounds for a TRO here. The motion should be denied.

**I.      Plaintiff Has No Probability of Success On The Merits.**

Plaintiff's memorandum in support of a TRO all but concedes the decisive issue in this case: McCormick Place is a non-public forum. This matters because the government's power to restrict speech turns on what kind of public property is at issue. In a traditional public forum – like streets, parks or Daley Center plaza – the government may not restrict speech based on content absent a compelling interest, and while it may impose content-neutral "time-place-manner" restrictions, such limits must be narrowly drawn to serve a significant interest, and must leave adequate alternative channels for speech. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). In a non-public forum, governmental restrictions on speech need only be "reasonable," consistent with the property's intended use. *Perry Education Assoc. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983); *Cornelius v. NACCP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985).

**A.      McCormick Place Is A Non-Public Forum.**

It has become axiomatic that "Government's ownership of property does not automatically open that property" as a public forum. *United States v. Kokinda*, 497 U.S. 720, 725 (1990). Instead, government property is a public forum only if it "has as a principal purpose promoting the free

10

exchange of ideas." *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672, 679
(1992). In *Kokinda*, the Supreme Court held that a sidewalk leading to post-office was not a public
forum because it was designed to provide access to the Post Office from its parking lot, and not as
a thoroughfare. 497 U.S. at 729. And in *Lee*, the Court held that the terminals of LaGuardia airport
were a non-public forum because, although open to the public and containing restaurants and other
amenities, their primary purpose was to facilitate air travel. 505 U.S. at 680.

Based on the foregoing, numerous appellate courts have held that public properties similar
to McCormick Place were non-public forums. Most prominently, *Chicago Acorn v. Metropolitan
Pier and Exposition Authority*, 150 F.3d 695 (7th Cir. 1998), held that the Authority's own Navy
Pier was a non-public forum. Navy Pier sees a broader array of visitors and recreational uses than
McCormick Place, and yet the Court agreed with the Authority that Navy Pier had been designed to
promote tourism, meetings, entertainment events and economic development, and not as a forum for
the free exchange of ideas. *Id.* at 702. This holding embraced *the entirety of Navy Pier*: the indoor
meeting facilities and Grand Ballroom; the Family Pavilion and its restaurants, museum and theater;
and the outdoor walkway known as South Dock Street that runs the entire length of the Pier, flanked
by boat docks and cafes. The *Acorn* case is practically *res judicata* here: since Navy Pier with all
its varied indoor and outdoor uses, spaces and walkways is not a public forum, there is no way the
far more austere, business-oriented McCormick Place can be a public forum. McCormick Place
looks, feels and (most importantly) was intended by the Illinois legislature to be operated exclusively
as a conference and convention facility. Absolutely nothing about either the inside or the outside
areas of McCormick Place suggests that they are dedicated to free speech.

11

Turning specifically to the interior areas of McCormick Place, similar large public interior spaces have been held to be non-public forums. The Denver "Galleria," for example, is a "glass covered pedestrian walkway approximately 600 feet long, with a width ranging between 32 and 42 feet," built over what "was formerly a public street." *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1284 (10th Cir. 1999). It was designed to link "adjacent performing arts complexes," and functions as a place "for patrons to congregate before performances and during intermissions." *Id.* The Galleria "can become extremely congested, particularly when multiple events are scheduled," and "serves as the main evacuation route for the performing arts complexes in the event of an emergency." *Id.* It also contains "several commercial establishments," including two cafes and a retail merchandise shop. *Id.* The Galleria is virtually indistinguishable from McCormick Place's Grand Concourse, and the court had no trouble concluding that it was a non-public forum. *Id.* at 1287-1288. The interior areas of McCormick Place thus are properly treated as a non-public forum. *Id*; accord *Grossbaum*, 100 F.3d at 1291 (lobbies of government buildings are non-public forums); *United States v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991) (same); *Int'l Caucus of Labor Comm. v. Maryland Dep't of Transportation*, 745 F.Supp. 323, 327 (D.Md. 1990) (interior walkways of government office are non-public forum).

A similar analysis applies to the exterior walkways at McCormick Place – in particular, to the walkways outside the main western entrance, where plaintiff apparently seeks access. The court in *Hampton International Communications v. Las Vegas Convention and Visitors Authority*, 913 F.Supp. 1402, 1410-1411 (D.Nev. 1996), held that virtually identical "ingress and egress" walkways at the Las Vegas convention center were non-public forums, reasoning that "they were created solely to manage the heavy pedestrian traffic which generally accompanies large, privately-organized

events for which the Convention Center was built." Not surprisingly, courts since *Kokinda* have routinely held that sidewalks surrounding or leading to government buildings or property are often non-public forums. *Kokinda*, 497 U.S. at 729 (sidewalk leading from post office to parking lot); *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992) (interior sidewalks of Vietnam War Memorial); *Jacobson v. Bonnie*, 123 F.3d 1272, 1273-1274 (9th Cir. 1997) (sidewalks around interstate rest-areas); *Sentinel Communications v. Watts*, 936 F.2d 1189 (11th Cir. 1991) (same).

In short, there is an avalanche of authorities holding that the entire interior and exterior confines of McCormick Place are a non-public forum. This point cannot seriously be disputed, and plaintiff has no probability of success on this issue.

**B.     The Authority's Exterior Zones Are A Reasonable Accommodation of Speech.**

The Supreme Court has repeatedly emphasized that governmental restriction on speech in a non-public forum "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Lee*, 505 U.S. at 683 (emphasis in original), citing *Kokinda*, 497 U.S. at 730 and *Cornelius*, 473 U.S. at 808. Here, the Authority has made a business and public safety decision to ban unlicensed public expression in the interior areas of McCormick Place, including the Grand Concourse where plaintiffs would like to pass out leaflets tomorrow. This is a reasonable judgment: the Authority's managers believe they will be less successful at attracting and retaining major convention business if their customers are subject to confrontation inside the facility by persons who disagree with them. The Authority likewise believes that protestors of any sort, including leafleters, represent a public safety risk inside a convention facility that at times becomes crowded and heavily congested with tens of thousands of visitors. Finally, the Authority has made more than adequate provision for plaintiff's free speech interests by designating an extremely large and highly visible

13

protest area just outside the western entrance where plaintiffs wish to protest tomorrow. This area is between the main parking garage and the facility's main entrance, and it is in plain view from all sides of McCormick Square, where most visitors enter McCormick Place. (As noted, the Authority provides a similar protest space outside Lakeside Center, on the eastern end of McCormick Place.)

Several cases support outright bans on public expression, including leafleting, in a large non-public forum. The Denver Galleria, for example, was closed to leafleting as well as other forms of public expression, and the Court upheld this restriction as reasonable: "allowing groups, including the plaintiffs, to leaflet and express themselves before and after performances invites a host of expressive activity at odds with the [Denver Performing Arts Center's] limited purpose as an entertainment venue." *Hawkins*, 170 F.3d at 1291. If an outright leafleting ban was reasonable there, it is reasonable at McCormick Place for the same reasons: leafleting invites expressive activity at odds with the business purpose of the nation's largest and most successful convention facility. Likewise, there was no suggestion that interior leafleting was allowed in the Las Vegas Convention Center. *Hampton*, 913 F.Supp. 1402.

In another recent case, the First Circuit upheld a total ban on public expression, including leafleting, at the "Fish Pier" in Boston. *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 22 (1st Cir. 2002). This government-owned pier operated predominantly as a commercial fishery port. However, it allowed "members of the public [to] enter the premises for a variety of [other] purposes," and it also contained "a conference center, two cateries and several offices." *Id*. The Court upheld a total ban public expression because "there is much less diversity of use on the Fish Pier than at a large commercial airport," and also because the government had reasonable and legitimate safety concerns about allowing leafleters on the Pier, given its confines and traffic. This

14

reasoning and result fully affirms the Authority's decision to allow protests and leafleting in two large exterior areas, but prohibit them altogether inside McCormick Place proper. Like the Fish Pier, McCormick Place is used exclusively to serve narrow, essentially private commercial interests. This feature justifies treating McCormick Place differently from a major airport – or Navy Pier, for that matter – where narrow, limited leafleting rights were recognized by courts on account of the open, multi-purposes uses of those facilities. *Lee*, 505 U.S. at 691 (O'Connor, concurring); *Acorn*, 150 F.3d at 703; *ISKCon Miami v. Metropolitan Dade County*, 147 F.3d 1282 (11th Cir. 1998).

## II. Plaintiff's Motion For TRO Is Barred By Her Own Inexcusable Delay.

"Equity aids only the vigilant, and injunctive relief will be denied to those who slumber upon their rights." *Int'l Union v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir. 1982). Applied here, this maxim requires that plaintiff's tactical choice to wait until the eleventh hour to spring this lawsuit on the Authority should not be rewarded. Indeed, the purported "emergency" here is entirely of plaintiff's own making. For this reason alone, plaintiff has failed to demonstrate irreparable harm; consequently, the request for a temporary restraining order should be denied. See *Quince Orchard Valley Citizens Assoc., Inc. v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1989) (affirming denial of request for preliminary injunctive relief where "much of the [plaintiff's] potential harm was a product of its own delay in pursuing this action").

The EPC Symposium that plaintiff wishes to protest has been openly advertised for at least five months, in a widely distributed brochure over the Internet, among other means. Ex. 16-22. As president of an organization that purports to have a keen interest in developments in the relevant technology, plaintiff cannot plausibly claim to have been unaware of this conference until the last week of August, when she first informed the Authority of her request. Thus, any claim that plaintiff

15

is now in "urgent" need of emergency relief is unsustainable. Delays of this sort have frequently been found to defeat plaintiffs' ability to establish that they have been irreparably harmed. *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (denying preliminary injunction where plaintiff waited two months); *Stokley-Van Camp Inc. v. Coca-Cola*, 1987 WL 6300, 2 U.S.P.Q.2d 1225, 1227 (N.D. Ill. 1987) (denying preliminary injunction where plaintiff delayed three months). As the Seventh Circuit recently put it, "self-inflicted wounds are not irreparable injury." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 849 (7th Cir. 2003).

Even in contexts like this, where irreparable harm is arguably presumed, "that presumption is overcome where the plaintiff delays in seeking injunctive relief." *MB Financial Bank, N.A., v. MB Real Estate Servs., L.L.C.*, 2003 WL 2462501, *20 (N.D. Ill. 2003) (denying request for preliminary injunction based on alleged trademark infringement). Thus, despite the usual presumption, "a court may infer from this delay that there is no threat of irreparable harm." *Ibid*; see also *id.* at *21 (delay "negates any inference of irreparable harm"); *Henri Studio, Inc. v. Outdoor Marketing, Inc.*, 1997 WL 652351, *6 (N.D. Ill. 1997) ("Although irreparable harm is presumed when terminated employees solicit former clients on behalf of a new employer * * *, delay in seeking injunctive relief may rebut the existence of irreparable harm"), *vacated pursuant to settlement*, 1998 WL 569303 (N.D. Ill. 1998); *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 887 (N.D. Ill. 1992) (trademark infringement).

In addition, plaintiff's decision to wait until the last minute to file this "emergency" motion constitutes laches, which also precludes any possibility of relief and any showing of irreparable harm. Since January, the EPC Symposium's show manager has presumably spent considerable sums in preparation for this event set to begin tomorrow. Plans for the symposium have been executed

in reliance on the Authority's established policies for the regulation of expressive activity. The Authority itself, the show manager, as well as the numerous speakers, presenters, conference attendees, have all been operating under the assumption that the interior of McCormick Place would be free of protesters who disagree with the conference's message. For the Authority's settled rules to be suddenly circumvented on the eve of the EPC Symposium would plainly work to the detriment of those who have made their plans in reliance in expectation that the interior of McCormick Place is a protest-free facility.[3]  Defendants thus would have been lulled into a false sense of security and acted to their detriment in reliance on plaintiff's unreasonable delay – establishing laches and barring any relief to plaintiff.  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824, 827 (7th Cir. 1999); *Apache Survival Coalition v. United States*, 118 F.3d 663, 665-666 (9th Cir. 1997) (affirming denial of motion for TRO based on doctrine of laches).

Regardless of whether laches applies here, plaintiff's delay may be deemed circumstantial evidence that the potential harm to plaintiff is not irreparable or as great as claimed.  *Eldon Industries, Inc. v. Rubbermaid, Inc.*, 735 F.Supp. 786, 797-798 (N.D. Ill. 1990); *Saukstelis v. City of Chicago*, 1990 WL 146711, *8 (N.D. Ill. 1990).  "Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Plaintiff's motion for a TRO should be denied.

---

[3]  It is also well-settled that the purpose of injunctive relief is to *preserve the status quo* until a plenary adjudication on the merits.  *Martin v. Helstad*, 699 F.2d 387, 389 (7th Cir. 1983); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 264 (7th Cir. 1981).  This constitutes an additional reason for denying this request for so-called "emergency" relief, where plaintiff is seeking to *upset* settled policies only hours prior to the event in question.

### III.   The Balance Of Harms Tips In The Authority's Favor.

Even if this Court concludes that plaintiff has some minimal chance of success, and even if this court ignores the lack of irreparable harm here, the balance of harms still tips in the Authority's favor. For reasons largely explained in the background section above, the intended date of plaintiff's protest will be an extremely busy day at McCormick Place, with an estimated upwards of 40,000 visitors. There is simply to basis on this record to ignore the Authority's existing policy and legitimate interior safety concerns, especially when plaintiff is free (if she wishes) to bring a very large, noisy and visible group of protestors to McCormick Place's existing free speech zone.

What's at stake here is not so much plaintiff's free speech rights as her desire to confront other private citizens. She has ample free speech rights at McCormick Place, but apparently this is not enough. What she wants is to get in the face, so to speak, of the business people who are promoting and discussing an electronic product code technology to which plaintiff objects. But the participants in the EPC Symposium licensed space at McCormick Place many months ago with an expectation of having a private, unmolested business meeting. At this point they are a captive audience inside McCormick Place, and the First Amendment provides little or no support for confronting such audiences. *Frisby v. Schultz*, 487 U.S. 474, 487 (1988) (no right to confront captive audience in residential home); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975) (noting government may restrict particular categories of speech where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure"); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 301-302 (1974) (finding no public forum where audience was captive on mass transit system). For these and other reasons, on September 16 the balance of harms favors restricting plaintiff to protesting outside, in the Authority's established free speech zone.

18

## CONCLUSION

For the foregoing reasons, the Authority respectfully request that plaintiff's motion for a preliminary injunction be denied.

Dated: September 15, 2003        Respectfully submitted,

THE METROPOLITAN PIER AND
EXPOSITION AUTHORITY and
LETICIA PERALTA-DAVIS, CEO

Bettina Getz
Daniel G. Hildebrand
David Fuller
MAYER, BROWN, ROWE & MAW LLP
Chicago, Illinois 60603
(312) 782-0600

19

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he caused to be served a copy of the attached

**Verified Memorandum In Opposition To Plaintiff's Motion For Temporary Restraining Order**

and **Affidavit of Thomas Mobley** by hand delivery on counsel for plaintiff below ~ 9/15/03:

        Harvey Grossman
        Adam Schwartz
        The Roger Baldwin Foundation of ACLU, Inc.
        180 North Michigan Avenue, Suite 2300
        Chicago, IL 60601

                                                               One of the attorneys for defendants

Bettina Getz
Daniel G. Hildebrand
David Fuller
MAYER, BROWN, ROWE & MAW LLP
Chicago, Illinois 60603
(312) 782-0600