**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DOCKETED

AUG  2 2004

| | | |
|---|---|---|
| KATHERINE ALBRECHT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 03 C 6472 |
| | ) | |
| v. | ) | |
| | ) | |
| METROPOLITAN PIER AND | ) | Magistrate Judge Denlow |
| EXPOSITION AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

FILED

JUL 3 0 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DEFENDANT'S MOTION TO DISMISS**
**THE SECOND AMENDED CLASS ACTION COMPLAINT**

Defendant Metropolitan Pier and Exposition Authority hereby moves to dismiss the

Second Amended and Supplemental Class Action complaint for the reasons stated in the attached

memorandum.  In tandem with this motion, the Authority also moves to stay the motion for class

certification because this matter is subject to dismissal as a matter of law, and moves instanter to

file a brief slightly in excess of 15 pages, on account of the important public issues at stake.

DATED:  July 30, 2004

Respectfully Submitted,

METROPOLITAN PIER AND
EXPOSITION AUTHORITY

By:  One of Defendant's Attorneys

Bettina Getz
Daniel G. Hildebrand
David W. Fuller
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street
Chicago, Illinois 60603
(312) 782-0600

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHERINE ALBRECHT, et al.,    )
    )
    Plaintiffs,    )    Case No. 03 C 6472
    )
    v.    )
    )
METROPOLITAN PIER AND    )    Magistrate Judge Denlow
EXPOSITION AUTHORITY,    )
    )
    Defendant.    )

*FILED*

*JUL 3 0 2004*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Plaintiffs' Second Amended Complaint raises a constitutional challenge to defendant Metropolitan Pier and Exposition Authority's policies regarding First Amendment activity at McCormick Place. The Authority's policy presently in force at McCormick Place was adopted effective July 1, 2004, and is entitled "Policy for Public Expression at McCormick Place." The Authority has repealed its prior policy that was in effect when the original complaint was filed.

Notwithstanding the Authority's substantial accommodation of speech interests in its new Policy for Public Expression, plaintiffs have attempted to prolong this litigation by filing a Second Amended Complaint. That pleading, however, fails to state a claim as a matter of law. First, to the extent the Second Amended Complaint attacks the Authority's new policy, that policy is constitutional on its face because it is virtually identical to a policy at Navy Pier that was substantially affirmed by the Seventh Circuit and adopted by the Authority pursuant to a subsequent injunction issued by the district court. *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695 (7th Cir. 1998); Ex. D (injunction dated 9/13/99). "Where the courts have already upheld a similar ordinance because of the governmental interests at stake,

a future litigant should not be able to challenge similar governmental interests without showing some distinction at the pleading stage." *Graff v. City of Chicago*, 9 F.3d 1309, 1323 (7th Cir. 1993). The Authority's new policy was also carefully drafted to account for case law affirming the constitutionality of policies at similar government facilities such as airports and office buildings. The Authority is aware of no case law that supports plaintiffs' complaint.

Plaintiffs' new complaint also lacks merit to the extent it challenges the Authority's prior policy on public expression. As the Authority documented in its previously-filed motion to dismiss as moot (which is hereby renewed), a public body is entitled to voluntarily withdraw or change its policies in the face of a litigation challenge. It is black-letter law that "the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the [government] will reenact the ordinance or one substantially similar." *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003). McCormick Place has repealed its prior speech policy and replaced it with a new policy that is substantially different in several crucial respects: it provides for interior leafleting zones, where none existed before; it states the Authority's interests in enacting the policy; and it provides clear written standards for granting and issuing permits and for an administrative appeal. As a result, plaintiffs' claims regarding the prior policy are now moot.

At bottom, what's at stake in this motion is whether a governmental body can pattern its policy after a constitutional model at a similar facility, and thereby escape the burden, risk and expense of further litigation. The Authority respectfully submits that under controlling case law, the answer is "yes." By adopting its new policy, the Authority has voluntarily undertaken the most it could have been compelled to do in this litigation, and as a result the case now must end.

2

# BACKGROUND[1]

*Characteristics and Uses of McCormick Place*

McCormick Place is the nation's premiere convention facility, located near downtown Chicago. Cmplt ¶ 13, 15. As presently configured, it is comprised of Lakeside Center, east of Lakeshore Drive, and the North and South Buildings west of Lakeshore Drive. Cmplt. ¶ 14. These three major exhibition spaces are linked together by the Grand Concourse and Level 2.5 of the South Building, and by a pedestrian bridge over Lakeshore Drive that connects Lakeside Center to the Grand Concourse. *Id.* An open space called "McCormick Square" lies to the west of the Grand Concourse, abutting Martin Luther King Drive and serving as a principal drop-off and entry point to McCormick Place. McCormick Place also has several parking facilities. *Id.* West of McCormick Square, across Martin Luther King Drive, there is a large parking lot connected to McCormick Place by a skybridge. South of Lakeside Center there is an adjoining underground parking facility linked to Lakeside Center by two foyers and walkways. Ex. B at 3.

McCormick Place's three buildings contain approximately 2.2 million square feet of exhibition space, 112 meeting rooms, three auditoriums, as well as various restaurants and stores. Cmplt. ¶ 15. The Authority licenses McCormick Place's exhibition and meeting rooms to a wide array of customers, who pay for the use of space at McCormick Place to gather and communicate with each other on a wide array of subjects. *Id.* at ¶¶ 2, 15. Plaintiffs indicated earlier in these proceedings that they do not seek access to areas under license to the Authority's customers.

---

[1]  The facts set forth herein are taken from the Second Amended Complaint, whose factual allegations (as opposed to legal conclusions) are assumed true for purposes of this motion, and also from publicly-available policies and records, of which the Court can take judicial notice. *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000) (court may consider documents subject to judicial notice on motion to dismiss); *Doherty v. City of Chicago*, 75 F.3d 318, 324 n. 4 (7th Cir. 1996) (taking judicial notice of rules of procedure for zoning board of appeals); *Demick v. City of Joliet*, 108 F.Supp.2d 1022, 1025 (N.D. Ill. 2000) (same, re local rules and regulations); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 739 n.12 (7th Cir. 1986); *Duferco Steel Inc. v. M/V Kalisi*, 121 F.3d 321, 324 n.3 (7th Cir. 1997) (defendant may attach documents referenced in complaint to motion to dismiss).

*The Authority's Former Policy Regarding Free Expression at McCormick Place*

Pursuant to the requirements of its enabling legislation, 70 ILCS 210/4, the Authority owns and operates McCormick Place for the primary purpose of attracting conventions, trade shows and meetings to Chicago, thereby supporting state and local jobs and economic development and contributing to the economic welfare of Illinois residents. Ex. B at 1. Thus, the Authority seeks to maintain McCormick Place as a convenient, flexible, attractive and professionally-managed facility dedicated to the needs of its customers.

To that end, the Authority has historically prohibited all forms of protesting, solicitation, leafleting and other organized expressive activity in the interior spaces of its facility that are not under license to customers. Ex. A (Former Policy). The Authority's judgment is that allowing such forms of expression in the public areas of McCormick Place would be disruptive and unwelcome to the Authority's customers, and would have a significant negative impact on the Authority's ability to attract and retain customers. Ex. B (New Policy). The Authority does not, of course, prohibit ordinary conversation between visitors in the public areas of McCormick Place, nor does it enforce any dress code that would limit visitors from wearing expressive clothing such as T-shirts or caps. Cmplt. ¶ 15; Ex. D at 5 (injunction at Navy Pier).

The Authority also strives to operate McCormick Place with the highest regard for public safety. McCormick Place poses unique emergency, traffic and crowd control challenges because of its vast size, tens of thousands of visitors, limited exits, small percentage of hallways and walkways to overall square footage, and lack of ready access (at most points on its perimeter) to streets and sidewalks. Ex. B at 2 (New Policy). As a result, the Authority's security personnel manage the facility and its visitors to avoid potential conflicts and are sensitive to disruptions that might cause a crowd to panic, priorities that have only sharpened since September 11.

These concerns informed the Authority's historical prohibition against unlicensed public expression inside its facility. Under the Authority's policy on public expression in force prior to July 1, 2004, the Authority maintained two outdoor "Designated Areas" for free speech removed from any exhibition spaces, in part so as to minimize the prospect of confrontation between customers and protestors and keep any such incidents safely outside the facility. Ex. A (Former Policy). Prior to plaintiff filing her original complaint in this matter, the Authority required persons wishing to engage in non-commercial expressive activity at McCormick Place to apply for a permit and confine their activities to the two Designated Areas. *Id.* One of these zones was in McCormick Square, measuring approximately 278' by 25', located on the walkway that runs between the main western parking garage and the main entrance to McCormick Place at Gate 4. The other was on the sidewalk outside Gate 30 of Lakeside Center, measuring approximately 55' by 32', located where patrons leaving that facility are picked up by taxicabs. *Id.*; Ex. B at 2.

Plaintiff filed her original complaint challenging this policy on First Amendment grounds on September 12, 2003. She sought equitable relief declaring the policy unconstitutional and enjoining the Authority from restricting her and like-minded persons to the Designated Areas. Her proposed expressive activity involved speaking to and confronting persons attending the Electronic Product Code ("EPC") Symposium, so as to express her concerns about the privacy intrusions of a development-stage supply chain technology called the "RFID" chip. Plaintiff moved for a temporary restraining order requiring the Authority to allow her and like-minded members of her organization, CASPIAN, to gather, wear T-shirts and distribute leaflets inside McCormick Place where the EPC Symposium was to occur. The motion for a TRO was denied. Defendant subsequently answered the complaint, and the parties engaged in discovery.

5

Plaintiff moved for leave to file an amended complaint on April 22, 2004. Like its predecessor, the amended complaint alleged that the Authority "violated the First Amendment by adopting and enforcing a policy banning all expressive activity" inside McCormick Place and anywhere outdoors on McCormick Place property apart from the two Designated Areas. Amd. Cmplt. ¶ 2. The amended complaint characterized the Designated Areas as "wholly inadequate venues for expressive activities" and supposedly invisible to the "overwhelming majority of visitors" to McCormick Place. *Id.* ¶¶ 22, 23(e), 24(d). There was no claim for damages. Rather, the prayer for relief sought only declaratory and injunctive relief invalidating the Authority's policy. The amended complaint also added a second plaintiff (Quentin Young) and sought class relief on behalf of other persons seeking to engage in expressive activity at McCormick Place. As a result, plaintiffs filed a motion to certify a class in connection with the amended complaint.

*The Authority's new "Policy on Public Expression at McCormick Place" dated June 30, 2004*

Effective June 30, 2004, the Authority's General Manager adopted a new "Policy on Public Expression at McCormick Place." Ex. B (New Policy). The new policy retains the two previously existing outdoor Designated Areas used in the Authority's prior policy, and it uses a similar permit application process. *Id.* at 2-3. In other respects, however, the new policy is unlike the prior policy. Part I of the new policy is entitled "Factual Findings And Statement of Authority's Interests." It explains the facility's purpose in attracting meetings and events to Chicago, the importance of maintaining a business environment conducive to the needs of McCormick Place's customers, and the public safety issues inherent in hosting tens of thousands of conventioneers in a large public facility. *Id.* at 1.

The new policy also creates five additional designated areas at McCormick Place in which individuals may engage in leafleting. Ex. B at 3. These are spread along the facility's

major interior pedestrian thoroughfare and elsewhere. The first is on the eastern end of the skybridge over Martin Luther King Drive that connects the western parking garage to the South Building. The second is on the western side of level 2.5 of the South Building (a tenant arcade), in clear view of Starbucks and persons walking past the shops and the common seating area. The third is just north of the walkway leading from the Grand Concourse to the skybridge over Lakeshore Drive that links the South Building to Lakeside Center. Thus, the Authority has created three leafleting zones arrayed along its main interior arterial walkways that link the different parts of McCormick Place into a unified facility. In addition, to provide broader access to Lakeside Center, the Authority has created two leafleting zones in the foyers adjacent to the underground parking facility that services Lakeside Center. *Id.*

Despite opening its interior to leafleting, however, the Authority was careful to avoid locating leafleters near licensed meeting spaces. As the Authority has indicated, its judgment is that locating a free speech zone next to an exhibition space would make that space less desirable to licensees, who spend significant sums of money to host their meetings in Chicago with an expectation of obtaining a professionally managed environment similar to their own business facility, and to comparable public and private convention facilities in other cities. Ex. B at 2.

Finally, the Authority has codified that the permit processes, standards and appeal procedures currently in use at Navy Pier shall also be applied at McCormick Place. Thus, the Authority's new policy discloses express criteria for reviewing and granting or denying permit applications; it describes the rules applicable to the designated areas in careful detail; it makes clear that commercial speech is not allowed except pursuant to license; and it provides for a written appeal to the general manager. Ex. B at 4-6.

7

*Judicial Review of The Authority's Navy Pier Policy*

Several years ago, the Authority expended considerable time and money litigating its public access policy at Navy Pier. The Authority substantially prevailed in that case, winning a ruling from the Seventh Circuit that Navy Pier was a non-public forum, and also persuading the district court that leafleting on Navy Pier was appropriately limited to half a dozen fixed zones. The Authority's policy at Navy Pier was adopted pursuant to a permanent injunction issued by the Northern District dated September 13, 1999 and modified June 28, 2000. Ex. D (injunction).

As reflected in the attached Navy Pier policy, four of Navy Pier's leafleting zones are outdoors, interspersed at regular intervals along the Pier's main outdoor thoroughfare that runs along the South Dock. Ex. C at 3. The other two zones are indoors, located in the western and eastern interior areas of Navy Pier.[2] In addition to these leafleting areas, the Authority permits all forms of public expression (including protests, demonstrations and the like) at Gateway Park, across from Navy Pier's main entrance, and on an area called the South Sidewalk, which abuts the pedestrian gate onto Navy Pier's popular "South Dock," where boat rides and concessions are located. *Id.* Thus, in the aggregate Navy Pier has two large outdoor free speech areas, where a full range of expressive activities is permitted, and six small leafleting zones, where only leafleting is allowed, arrayed along the Pier's walkways.

The Authority's new policy at McCormick Place is very similar to its policy at Navy Pier. The Authority continues to have two large outdoor free speech zones at McCormick Place – the existing McCormick Square and Lakeside Center sidewalk areas. These remain available for a full range of public expressive activities, such as demonstrations, holding placards and the like.

---

[2] Moving from west to east, the first outdoor leafleting area at Navy Pier is at the base of the Grand Stairs leading up to the Ferris Wheel; the second is at bollard 21, at approximately the Pier's mid-point; the third is on the steps outside the Stained Glass Museum; and the fourth is outside the Grand Ballroom in the East End Plaza. The western interior zone is located behind Charlie's Ale House, and the eastern one is in a foyer below Festival Hall. *Id.* at 3-4.

The outdoor zones are also attractive locations for press conferences, in that the signature architecture of the east and west sides of the facility are clearly visible behind them. As on Navy Pier, McCormick Place's new policy creates five leafleting zones along the main pedestrian thoroughfares linking the South and North Buildings, Lakeside Center and the west expansion, and on the walkways from parking Lot C into Lakeside Center. Unlike Navy Pier, however, all five zones at McCormick Place are located indoors, sheltered from the elements.

While the Authority continues to believe that McCormick Place is different from Navy Pier, and its use as a convention and meetings facility justifies blanket restrictions on interior expressive activity comparable to government-owned office buildings like the Dirksen building, the Authority nevertheless exercised its discretion to enact a new free expression policy at McCormick Place that is more accommodating of speech interests than its prior policy. The Authority also wished to avoid the litigation expenses necessary to continue defending the prior policy. For these reasons, the Authority deemed it to be in its own and the public's best interest to enact a policy at McCormick Place similar to the one that was judicially imposed at Navy Pier.

*The Second Amended Complaint*

In tandem with adopting its new Policy for Public Expression at McCormick Place, on June 21, 2004, the Authority moved to dismiss the plaintiffs' amended complaint as moot. At the hearing before this Court on June 23, plaintiffs stated their intent to continue this litigation in spite of the Authority's new policy. The Authority therefore withdrew its motion in expectation of reviewing the Second Amended Complaint and considering what response was appropriate. Plaintiffs filed their new complaint on July 7, 2004. That complaint makes essentially the same allegations about the Authority's former policy that were at issue in the original and amended complaints, and it also challenges the constitutionality of the Authority's new policy.

## ARGUMENT

I. **The Authority's New Policy Is Constitutional On Its Face.**

The Seventh Circuit has held that it is appropriate to dismiss constitutional challenges to public enactments when the complaint does not assert any colorable basis for attacking the government's policy. *Graff v. City of Chicago*, 9 F.3d 1309, 1323 (7th Cir. 1993). This is particularly true where the challenged policy is modeled on a prior policy that has been tested in court. "Where the courts have already upheld a similar ordinance because of the governmental interests at stake, a future litigant should not be able to challenge similar governmental interests without showing some distinction at the pleading stage." *Id.* Based on prior cases establishing the City's right to regulate structures on the public way, the *Graff* court concluded "as a matter of law" that the City could "reasonably restrict newsstands to selling daily newspapers" and could prohibit plaintiff from operating "a larger newsstand in which to sell books, videotapes and other methods of expression." *Id.* Likewise, *International Caucus of Labor Committees, et al. v. City of Chicago*, 816 F.2d 337, 339-340 (7th Cir. 1987), affirmed dismissal of a complaint challenging O'Hare Airport regulations that prohibited setting up tables to pass out literature. Relying in part on a prior decision reviewing O'Hare's policy, the Court concluded that the restrictions were constitutional. *Id.* These decisions establish that a First Amendment complaint can be dismissed on the pleadings when, as here, the challenged policy has been judicially approved and no decisional law supports the complaint.

A. **The *Acorn* Case Determines The Outcome of This Case: McCormick Place Is A Non-Public Forum, And The Authority's Policy Is Reasonable.**

Based on the foregoing standard, plaintiffs' challenge to the Authority's new Policy for Public Expression at McCormick Place can be rejected as a matter of law under the Seventh Circuit's holding in *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695

(7th Cir. 1998). *Acorn* held that Navy Pier was a non-public forum. *Id.* at 702. The Seventh Circuit's account makes clear that Navy Pier has a broader array of visitors and recreational uses than McCormick Place, yet the court concluded that Navy Pier had been designed to promote tourism, meetings, entertainment events and economic development, and not as a forum for the free exchange of ideas. *Id.* As a result, the more austere, business-oriented McCormick Place is a non-public forum as well. The Authority's enabling legislation confirms that the two facilities were set up to serve related purposes, that the legislature intended McCormick Place to be run as a convention facility, and that both facilities are both non-public forums. 70 ILCS 210/4-5.

McCormick Place's status as a non-public forum means that the legal standard for reviewing the constitutionality of the Authority's policy is deferential: restrictions on speech in such a facility need only be "reasonable," consistent with the property's intended use. *Perry Education Assoc. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985). Importantly, the government's restrictions need not be the "most reasonable or only reasonable limitation." *Grossbaum v. Indianapolis-Marion County Building Auth.*, 100 F.3d 1287, 1299 (7th Cir. 1996). In *Acorn*, although the Seventh Circuit substantially vindicated the Authority's policies, the court held that reasonable accommodation of speech interests required that the Authority open Navy Pier to leafleting. 150 F.3d at 700. In this regard, the court followed *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992), which held that the terminals of LaGuardia Airport were a non-public forum, but that (pursuant to Justice O'Connor's deciding concurrence) limited leafleting, such as a zone near the airport chapel, should be made available. *Id.* at 693.

After the Seventh Circuit's opinion, on remand the parties in *Acorn* contested at length what rules regarding leafleting were reasonable, consistent with the legal standard applicable to a

non-public forum. The plaintiffs asserted that leafleters should be allowed to roam freely over broad areas of the facility, much as plaintiffs presently seek access to whatever portions of McCormick Place may be hosting a group that plaintiffs wish to contact. Ultimately, however, the district court affirmed that the Authority had the right to restrict leafleting to six small fixed zones on Navy Pier, accommodating one leafleter per zone. Ex. D at 4-5; accord, *Ayers v. City of Chicago*, 125 F.3d 1010, 1016 (7th Cir. 1997) (even in public forum, City could "require that peddling be confined to specified, fixed locations ... rather than allowing the peddlers to wander everywhere"). This is exactly what the Authority has done at McCormick Place under its new policy, and the judicial resolution of these questions as to Navy Pier effectively resolves them at McCormick Place as well. *International Caucus*, 816 F.2d at 339-340; *Graff*, 9 F.3d at 1323.

Plaintiffs will likely argue that McCormick Place and Navy Pier are sufficiently different that the constitutionality of applying Navy Pier's policy at McCormick Place cannot be decided without a hearing. This is wrong for several reasons. In the first place, both facilities are owned and operated by the same entity, which was set up by the legislature for a particular purpose: to promote tourism and economic development in Chicago. In addition, while the two facilities are not identical, the differences between them can be readily discerned as a matter of common sense, and based on the facts as pled in the complaint and the Seventh Circuit's *Acorn* decision. These differences favor the Authority's discretion to conclude that *greater* speech restrictions are "reasonable" at McCormick Place. Unlike Navy Pier, McCormick Place is primarily focused on attracting conventions, trade shows and meetings to Chicago. In contrast, while Navy Pier contains a much smaller meetings facility, more of its space is dedicated to public recreation. In the Authority's judgment, leafleting zones are less disruptive at a bustling entertainment facility like Navy Pier than they are at a business-focused convention center like McCormick Place. As

12

a result, by adopting a speech-permissive policy at McCormick Place that was judicially imposed at Navy Pier, the Authority has made a more than ample accommodation of free speech interests at McCormick Place. Nothing more is required under the "reasonableness" standard applicable to non-public forums. *Grossbaum*, 100 F.3d at 1299.

**B.    All Other Relevant Decisional Law Confirms That McCormick Place Is A Non-Public Forum, And That The Authority's Policy Is Reasonable.**

Even if this Court were to conclude that the *Acorn* case alone is not enough to dismiss plaintiffs' complaint, a raft of cases from around the country confirms that the Authority's new policy is constitutional on its face. The Authority is aware of no reported decision suggesting that it can be compelled to do more than offer a handful of leafleting zones inside its facility. Indeed, the case law broadly supports the Authority's prior policy banning expressive activities from the interior of McCormick Place. By adopting its new policy, the Authority is now also in compliance with those few decisions that arguably required providing interior leafleting zones.

The Authority cited much of the controlling case law in its brief in opposition to the motion for temporary restraining order. The Tenth Circuit, for example, has held that the Denver Galleria is a non-public forum. *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999). That court described that facility as a "glass-covered pedestrian walkway approximately 600 feet long, with a width ranging between 32 and 42 feet," built over what "was formerly a public street." It was designed to link "adjacent performing arts complexes," and functions as a place "for patrons to congregate before performances and during intermissions." *Id* at 1284. As described, the Galleria is indistinguishable from McCormick Place's Grand Concourse, and yet the court had upheld a total ban on leafleting. *Id.* at 1288.

In a similar vein, *Hampton International Communications v. Las Vegas Convention and Visitors Auth.*, 913 F.Supp. 1402, 1410-1411 (D.Nev. 1996), held that the "ingress and egress"

walkways at the Las Vegas convention center were a non-public forum, and upheld a policy that restricted leafleting to paid customers of the facility. The court reasoned that the walkways "were created solely to manage the heavy pedestrian traffic which generally accompanies large, privately-organized events for which the Convention Center was built." *Id.* The First Circuit likewise upheld a ban on leafleting outside a conference center on Boston's Fish Pier. *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 23 (1st Cir. 2002). Publicly-owned sports stadiums are also considered non-public forums where leafleting may be banned because it would "disrupt the normal activities of the complex." *ISKCon v. New Jersey Sports and Exposition Auth.*, 691 F.2d 155, 161 (3d Cir. 1982); accord, *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Comm'n*, 797 F.2d 552, 555 (8 th Cir. 1986). See also *Hotel Employees & Restaurant Employees Union v. City of New York Dept. of Parks & Recreation*, 311 F.3d 534, 555-556 (2d Cir. 2002) (upholding flat ban on leafleting in Lincoln Center plaza); *United States v. Kokinda*, 497 U.S. 720, 729-730 (1990) (sidewalk from post office to parking lot was non-public forum); *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992).

The following cases also establish that the Authority's new Policy on Public Expression fully comports with the Constitution. *ISKCon Miami v. Metropolitan Dade County*, 147 F.3d 1282 (11th Cir. 1998) (Miami International Airport was non-public forum; regulations limiting leafleters to eight fixed zones sprinkled throughout the airport were constitutional); *Sefick v. Gardner*, 164 F.3d 370, 372-373 (7th Cir. 1998) (lobby of Dirksen federal building in Chicago "is not a traditional public forum or a designated public forum, not a place open to the public for the presentation of views ... It is a nonpublic forum, which government may reserve for its intended purposes"); *Grossbaum*, 100 F.3d at 1298 (noting lobby of Indianapolis' city-county building was a non-public forum, and affirming building's content-neutral ban on expression);

14

*Families Achieving Independence and Respect v. Nebraska Department of Social Services*, 111 F.3d 1408, 1419-1420 (8th Cir. 1997) (lobby of state welfare office was nonpublic forum; government could prohibit welfare rights advocacy organization from posting and distributing materials and speaking with welfare recipients in the lobby); *Sefick v. United States*, 1999 WL 778588, **9-12, 16 (N.D. Ill. 1999) (lobby of Chicago's Metcalfe federal building was a nonpublic forum; "GSA has responsibilities to its tenant agencies and to visitors to provide an appropriate forum in which to conduct government business").

Finally, it should be mentioned that much of the decisional law in this area, including the *ISKCon v. Lee* case, pre-dates America's 9/11 disaster and the heightened security concerns that have preoccupied managers of large public facilities ever since. Based on such concerns, the Authority would be within its rights to close McCormick Place to the public and restrict admission to persons who were badged or ticketed to attend a licensed event. Indeed, the case law fully supports the government's right to close a non-public forum to speech altogether. *E.g.*, *Grossbaum, Sefick* and *Families Achieving Independence, supra*. While the Authority has not yet determined to take such a step, given the Authority's range of options it seems absurd to suggest that its current policy of keeping the facility open to the general public, and providing leafleting zones for protestors, is somehow unconstitutional.

## II.  The Second Amended Complaint's Attack On The Prior Policy Is Moot.

The Authority's enactment of the new policy also renders moot those portions of the Second Amended Complaint that continue to challenge the Authority's prior policy. Cmplt. at ¶¶ 17-33, 68 and Prayer for Relief. "In a string of cases, the [Supreme] Court has upheld the general rule that repeal, expiration, or significant amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's request for injunctive relief." *Federation of*

*Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003). The Seventh Circuit has likewise "repeatedly held that the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar." *Id.*

This basic principle of justiciability is not limited to legislatively enacted statutes, but applies with equal force to agency regulations and other less "formal" governmental policies. *See, e.g., Ragsdale v. Turnock*, 841 F.2d 1358, 1365-1366 (7th Cir. 1988) (regulation); *Jews for Jesus Inc. v. Hillsborough County Aviation Authority*, 162 F.3d 627, 629 (11th Cir. 1998) (airport literature distribution policy); *Jones v. Bowman*, 120 F.R.D. 88, 90-91 (N.D. Ill. 1988) (assurance by government official). Moreover, because the Authority is a governmental entity, its decision to voluntarily repeal the challenged policy merits "more solicitude" from this Court than would "similar action by private parties." *Ragsdale*, 841 F.2d at 1365. Courts generally will credit public officials' decisions to cease enforcing prior enactments "so long as they appear genuine." *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991).

The new "Policy for Public Expression at McCormick Place" easily passes this test. Far from being "substantially similar" to the prior policy, the new policy changes the very conduct challenged in prior pleadings. For example, the previous complaint objected to the Authority's "policy of banning all expressive activity . . . anywhere inside the McCormick Place buildings (other than in areas licensed to MPEA customers and under the sole control of such customers)" and "anywhere on McCormick Place property outside the McCormick Place buildings, with the narrow exception of two inadequate 'designated areas' for expressive activity located far from the flow of McCormick Place visitors." Amd. Cmplt. ¶ 2. As indicated above, however, the Authority's new policy no longer restricts expression to the two outdoor zones, but instead adds

16

five interior leafleting zones. It also offers a more transparent statement of the Authority's interests, the criteria for issuing permits, and the rights of appeal. The Authority's good faith in implementing the new policy is underscored by the fact that, effective June 30, 2004, the new policy was disseminated to all relevant personnel responsible for enforcement. The new policy has also been made public by virtue of this litigation. *See Ragsdale*, 841 F.2d at 1365-66.

Finally, the new policy is comprehensive, adopted after careful review by the General Manager of McCormick Place and several years experience with a substantially similar policy at Navy Pier. While the Authority maintains that its prior policy comported with constitutional requirements (and thus no change was necessitated by law), the Authority decided to establish additional leafleting zones along walkways inside McCormick Place, thereby giving leafleters access to pedestrian traffic at several interior locations. Through its strategic placement of the zones, the new policy accomplishes this goal in a manner consistent with the legitimate business, safety and security needs that motivated the Authority's opposition to plaintiff's request for a TRO. The Authority also wished to avoid the expense of further litigation and potential liability for attorneys fees. *Federation of Advertising Industry Representatives*, 326 F.3d at 931 ("desire to avoid substantial litigation costs" is a legitimate basis to repeal ordinance, and Court refused to "fault the City for its attempts to craft an ordinance that passes constitutional muster").

## CONCLUSION

For the foregoing reasons, the Authority asks that this case be dismissed in its entirety.

17

Dated:  July 30, 2004

Respectfully Submitted,

METROPOLITAN PIER AND
EXPOSITION AUTHORITY

By: One of Defendant's Attorneys

Bettina Getz
Daniel G. Hildebrand
David W. Fuller
MAYER, BROWN, ROWE & MAW LLP
190 South LaSalle Street
Chicago, Illinois 60603
(312) 782-0600

SEE CASE
FILE FOR
EXHIBITS