# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KATHERINE ALBRECHT and
QUENTIN YOUNG,

        Plaintiff,

    v.

METROPOLITAN PIER AND
EXPOSITION AUTHORITY, and LETICIA
PERALTA DAVIS, in her official capacity
as Chief Executive Officer of the
Metropolitan Pier and Exposition Authority,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 03 C 6472

Magistrate Judge Denlow

**DOCKETED**

SEP 0 1 2004

*FILED*
AUG 3 0 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

TO:   **SEE SERVICE LIST**

    PLEASE TAKE NOTICE THAT on August 30, 2004, we filed with the Clerk of the

United States District Court for the Northern District of Illinois the **PLAINTIFFS' RESPONSE**

**TO DEFENDANTS' MOTION TO DISMISS**, a copy of which is attached hereto and hereby

served upon you.

                 By: _____
                            Plaintiffs' Attorney

HARVEY GROSSMAN
ADAM SCHWARTZ
CONNIE CHUNG
Roger Baldwin Foundation
 of ACLU, Inc.
180 North Michigan Avenue
Suite 2300
Chicago, Illinois 60601
(312) 201-9740

37

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KATHERINE ALBRECHT and QUENTIN )
YOUNG, on behalf of themselves and all )
persons similarly situated, )
)
        Plaintiffs, )    Case No. 03 C 6472
)
    v. )    Magistrate Judge Denlow
)
METROPOLITAN PIER AND )
EXPOSITION AUTHORITY, )
)
        Defendant. )

**DOCKETED**

SEP 0 1 2004

## PLAINTIFFS' RESPONSE
## TO DEFENDANTS' MOTION TO DISMISS

HARVEY GROSSMAN
ADAM SCHWARTZ
CONNIE CHUNG
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
(312) 201-9740

WILLIAM J. GIBBONS
ERIN SHAW
DAVID CAMPBELL
Latham & Watkins
233 S. Wacker Drive, Suite 5800
Chicago, Illinois 60606
(312) 876-7700

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

    A.   McCormick Place ..............................................................................3

    B.   The MPEA's 2001 policy ..................................................................4

    C.   The MPEA's application of its 2001 policy against Albrecht.......................4

    D.   The MPEA's 2004 policy....................................................................6

    E.   The MPEA's application of its 2004 policy against Young...........................7

ARGUMENT ....................................................................................................8

I.    This case requires adjudication of site-specific, individualized facts .....................8

II.    The 2004 policy violates the First Amendment ......................................14

    A.   Leafleting is highly protected by the First Amendment ...........................14

    B.   The publicly accessible areas of McCormick Place are traditional public forums ....................................................................................15

        1.   McCormick Square .............................................................15

        2.   The publicly accessible interior areas .......................................17

        3.   Areas outside the facility gates ..............................................18

    C.   The MPEA's 2004 policy fails the "time, place, and manner" test ...........19

        1.   The 2004 policy is not narrowly tailored .......................................19

            a.   The MPEA's economic interests .......................................19

            b.   The MPEA's pedestrian flow and safety interests.............21

        2.   The alternative communication channels are inadequate .............22

    D.   The MPEA's 2004 policy fails the "reasonableness" test .........................24

    E.   The MPEA's 2004 policy comprises a "heckler's veto." .........................27

i

III.    Plaintiffs' challenge to the 2001 policy is not moot ...............................................28

       A.    Plaintiffs' injunctive claims ....................................................................28

       B.    Albrecht's damages and declaratory claims .............................................30

CONCLUSION....................................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACLU v. GSA*, 235 F. Supp. 2d 816 (N.D. Ill. 2002) ........................................................ 22

*Air Line Pilots Assoc. v. Department of Aviation*, 45 F.3d 1144 (7th Cir. 1995) .............. 9

*Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997) .......................................... 13, 22

*Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990) ........................... 28

*Board of Airport Commrs. of Los Angeles v. Jews for Jesus*, 482 U.S. 569 (1987) ......... 25

*Boos v. Barry*, 485 U.S. 312 (1988) ..................................................................................... 8

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Srvcs.*, 532 U.S. 598 (2001) ...................................................................................... 30

*Carreras v. City of Anaheim*, 768 F.2d 1039 (9th Cir. 1985) ........................................... 20

*Chicago Acorn v. MPEA*, 150 F.3d 695 (7th Cir. 1998) ........................................... passim

*Chicago Acorn v. MPEA*, 1998 WL 164882 (N.D. Ill. 1998) ........................................... 13

*Chicago Acorn v. MPEA*, 1999 WL 413480 (N.D. Ill. June 2, 1999). ............................. 10

*Church of American Knights of KKK v. City of Gary*, 334 F.3d 676 (7th Cir. 2003) ....... 27

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ........................................ 28

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788 (1985)... 11, 13, 18

*Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004) .................................................................... 30

*Doherty v. City of Chicago*, 75 F.3d. 318 (7th Cir. 1996). .................................................. 8

*Families Achieving Independence and Respect v. Nebraska Dept. of Social Services*, 111 F.3d 1408 (8th Cir. 1997) .................................................................. 13, 18, 23, 27

*Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924 (7th Cir. 2003) ........................................................................................ 29

*Ferner v. Toledo-Lucas County Convention Center*, 610 N.E.2d 1158 (Ohio Ct. App. 1992) ......................................................................... 21

*Forsyth County v. The Nationalist Movement*, 505 U.S. 123 (1992)................................. 28

*Frisby v. Schultz*, 487 U.S. 474 (1988) ........................................................................... 19

*Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975) ............................................. 28

*Graff v. City of Chicago*, 9 F.3d 1309 (7th Cir. 1993)................................... 8, 9, 11, 12, 13

*Gregory v. Chicago*, 394 U.S. 111 (1969)....................................................................... 27

*Grossbaum v. Indianapolis-Marion County*, 100 F.3d 1287 (7th Cir. 1996).............. 18, 26

*Hampton International Comm., Inc. v. Las Vegas Convention and Visitors Auth.*,
913 F. Supp. 1402 (D. Nev. 1996)............................................................................. 13, 17

*Hawkins v. City and County of Denver*, 170 F.3d 1281 (10th Cir. 1999)........ 13, 16, 23, 26

*Hotel Employees & Rest. Employees Union v. City of New York*,
311 F.3d 534 (2nd Cir. 2002) .................................................................................. 13, 17, 23

*Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Commn.*,
797 F.2d 552 (8th Cir. 1986) ............................................................................................ 13

*International Caucus of Labor Committees v. City of Chicago*,
816 F.2d 337 (7th Cir. 1987). ........................................................................................ 9, 13

*ISKCON v. Lee*, 505 U.S. 672 (1992) ............................................................. 13, 15, 24, 26

*ISKCON Miami v. Metropolitan Dade County*, 147 F.3d 1282 (11th Cir. 1998).........13, 26

*ISKCON v. New Jersey Sports and Exposition Auth.*,
691 F.2d 155 (3rd Cir. 1982). ............................................................................... 13, 18, 26

*Jamison v. Texas*, 318 U.S. 413 (1943) ........................................................................... 14

*Kikumura v. Turner*, 28 F.3d 592 (7th Cir. 1994)...................................................... 28, 29

*Lovell v. City of Griffin*, 303 U.S. 444 (1938) ........................................................... 14, 15

*Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997)...................................................... 28

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ...................................................... 14, 15

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)............................................. 14

*New England Regional Council of Carpenters v. Kinton,*
284 F.3d 9 (1st Cir. 2002)........................................................................ 12, 13, 16, 26, 27

*New York Times Co. v. Sullivan,* 376 U.S. 254 (1964) ...................................................... 8

*Perry Educ. Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37 (1983) .................... 13

*Ragsdale v. Turnock,* 841 F.2d 1358 (7th Cir. 1988) ........................................................ 29

*Robins v. Pruneyard Shopping Center,* 592 P.2d 341 (Cal. 1979) ................................... 21

*Schneider v. State of New Jersey,* 308 U.S. 147 (1939)........................................ 14, 15, 22

*Sefick v. Gardner,* 164 F.3d 370 (7th Cir. 1998) ....................................... 13, 18, 23, 26, 29

*Sefick v. United States,* 1999 WL 778588, *1 (N.D. Ill. 1999)............................. 13, 18, 26

*Talley v. California,* 362 U.S. 60 (1960) .......................................................................... 14

*United States v. Grace,* 461 U.S. 171 (1983)............................................................... 14, 15

*United States v. Kokinda,* 497 U.S. 720 (1990) ........................................ 11, 13, 15, 17, 26

*United States v. W.T. Grant Co.,* 345 U.S. 629 (1953)...................................................... 28

*Veazy v. Communication & Cable Co.,* 194 F.3d 850 (7th Cir. 1999). ............................... 1

*Venture Assocs. Corp. v. Zenith Data Sys., Corp.,* 987 F.2d 429 (7th Cir. 1993). .............. 8

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) ................................................... 19, 22

*Warren v. Fairfax County,* 196 F.3d 186 (4th Cir. 1999) ................................. 11, 15, 16, 19

*Watchtower Bible and Tract Society v. Village of Stratton,* 536 U.S. 150 (2002) ..... 14, 15

*Weinberg v. City of Chicago,* 310 F.3d 1029 (7th Cir. 2002)....................................... 19, 22

## INTRODUCTION[1]

McCormick Place is the nation's premier convention center. Many governmental, religious, professional, and other groups license space at McCormick Place to gather, communicate, and make decisions regarding a myriad of important and far-reaching public issues. Millions of people attend these events, including political and business leaders.

Scores of unlicensed individuals and groups, in turn, attempt to communicate with the visitors gathered at McCormick Place regarding a host of public issues. For example, plaintiff Quentin Young in June 2004 sought to express his support of universal health care to health care professionals gathered at a conference. Similarly, plaintiff Katherine Albrecht sought to express her opposition to a privacy-invading technology to visitors at a gathering regarding that technology.

All of this speech is protected by the First Amendment, because McCormick Place is run by the Metropolitan Pier and Exposition Authority ("MPEA"), a unit of state and local government. Unfortunately, the MPEA has adopted and enforced two written policies that restrict non-licensees' expressive activity at McCormick Place to inadequate areas that do not allow effective communication with facility visitors. The 2001 policy restricted such speech to two inadequate outdoor areas. The 2004 policy (adopted in response to this lawsuit) added five inadequate indoor areas.

---

[1] Whenever "it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Veazy v. Communication & Cable Co.*, 194 F.3d 850, 854 (7th Cir. 1999). Plaintiffs herein allege such facts, and intend to prove them at trial.

1

Plaintiffs simply seek a reasonable opportunity to effectively communicate with McCormick Place visitors. This could be achieved by more fixed indoor and outdoor zones for leafleters, and more fixed outdoor zones for other expressive activities. Such relief would not burden the MPEA's economic, pedestrian flow, and other interests. Plaintiffs do *not* seek to wander the facility while handing out leaflets, or to engage in any expressive activity within licensed meeting rooms.

The MPEA's pending motion to dismiss should be denied. The 2004 policy cannot be upheld as a matter of law, because plaintiffs allege material facts regarding the instant facility, policy, speech, and governmental interests that are distinct from those in the cases cited by the MPEA. Moreover, plaintiffs' challenge to the 2001 policy survives the motion to dismiss: the withdrawal of this policy did not moot plaintiffs' injunctive claims, because there is a significant possibility of reissuance; and withdrawal cannot moot plaintiff Albrecht's damages and declaratory claims. In short, resolution of this case requires fact-based adjudication.[2]

---

[2] The MPEA erroneously alleges that "plaintiffs have attempted to prolong this litigation." MD at p. 1. In fact, the MPEA has prolonged this litigation by refusing, time and again, to participate in settlement discussions. Instead, the MPEA at the TRO hearing and through many months of subsequent discovery insisted that it could never tolerate leafleting inside the facility, and then switched course and unilaterally implemented inadequate indoor zones. Similarly, the MPEA initially refused to grant Albrecht permission to wear expressive clothing inside McCormick Place, and then switched course after Albrecht addressed this issue in her original complaint and TRO memorandum. Exh. 1 at ¶¶ 28-30, 32. The MPEA's ever-changing positions and "policies" have substantially increased plaintiffs' burden of prosecuting this lawsuit. The MPEA's discovery foot-dragging for the last three months has further prolonged this litigation. Plaintiffs now renew their suggestion that the best way to expedite resolution of this case is through face-to-face, court-supervised settlement discussions.

## BACKGROUND

**A.** **McCormick Place.**

McCormick Place is the nation's premier convention facility, containing 2.2 million square feet of exhibit space and hosting 4,000,000 visitors per year. Exh. 1 (plaintiffs' second amended complaint) at ¶¶ 14(b) and 15(a). It is comprised of the Lakeside Center east of Lake Shore Drive; the Grand Concourse, North Building, and South Building west of Lake Shore Drive; a pedestrian bridge over Lake Shore Drive; and surrounding parking facilities. *Id*. at ¶ 14(a). Also, a park called McCormick Square is located west of the Grand Concourse. The facility is owned, operated, and controlled by the MPEA, which is a unit of state and local government. *Id*. at ¶ 7.

As a convention center, the core function of McCormick Place is to facilitate speech and expressive association. Many governmental, religious, and professional organizations license space there to gather and communicate regarding important public issues. Exh. 1 at ¶ 15(b). Elected officials participate in facility functions. Based on the MPEA's post-litigation position, visitors commonly wear clothes that bear a wide variety of written and other messages. *Id*. at ¶¶ 15(d) & (e).

Many locations inside and outside the facility are open to the public – including persons with no connection to facility events – to freely enter, move about, gather, and communicate. Exh. 1 at ¶ 14(d). The facility provides direct access to the City's transportation grid, including streets, sidewalks, and the Metra train. *Id*. at ¶ 14(c). Many interior locations are more than 50 feet wide and allow a high volume of pedestrian flow. *Id*. at ¶ 14(e). The facility contains dozens of restaurants and stores, all of which display commercial advertisements. *Id*. at ¶ 14(f). It also contains seating areas

3

immediately adjacent to beautiful fountains and artwork, used and plainly designed as places for the public to stop, gather, and relax. *Id.* at ¶ 14(g).

**B.     The MPEA's 2001 policy.**

On October 1, 2001, the MPEA promulgated a written policy regarding expressive activity at McCormick Place by non-licensees ("the 2001 policy"). It banned such activity anywhere at McCormick Place, except for two inadequate outdoor areas. Exh. 1 at ¶¶ 17-20, 21. The MPEA rigidly enforced this policy, and thereby prevented scores of people from effectively communicating with their intended audiences.

"Designated Area 1" is located 103 feet south of Gate 30 of the Lakeside Center. This noisy location is wedged between Lake Shore Drive and a truck loading dock. Exh. 1 at ¶¶ 22(a) & (b). Almost no one walks near this designated area. While there is a cab stand immediately outside Gate 30, only a small trickle of visitors use it (as opposed to the facility's many other cab stands), and these visitors would have no reason to walk the 100 feet towards the designated area. *See id.* at ¶¶ 22(c) & (d).

"Designated Area 2" is located at the western edge of McCormick Square, "on the sidewalk between the pylons on Martin Luther King Drive." *See* the MPEA's motion to dismiss ("MD") at Exh. A (the 2001 policy) at p. MPEA 2525. It is 279 feet away from Gate 4, the main western facility entrance. Exh. 1 at ¶ 23(a). Visitors who use Gate 4 cannot see or hear the messages being expressed at Area 2. *See id.* at ¶ 23(d).

**C.     The MPEA's application of its 2001 policy against Albrecht.**

Plaintiff Katherine Albrecht is a graduate student and a consumer privacy advocate. Exh. 1 at ¶ 6. She opposes the development and use of Radio Frequency Identification ("RFID") to tag and track individual consumer products. *Id.* at ¶ 24.

4

In September 2003, McCormick Place hosted the Electronic Product Code
Symposium regarding RFID. Exh. 1 at ¶ 25. Thousands of key RFID decision makers
were invited. *Id.* at ¶¶ 25, 26. Albrecht and likeminded persons wished to join together
to express their opposition to RFID to Symposium participants. *Id.* at ¶ 26. They
determined that an effective and non-disruptive means to do so was to distribute leaflets
inside the Grand Concourse (and thus in reasonable proximity to visitors walking to
Symposium events in the nearby North Building meeting rooms), and also to distribute
leaflets and carry expressive signs outside and close to Gate 4 (and thus in reasonable
proximity to a primary entry point for Symposium visitors). *See id.* at ¶ 26. They did not
(in the MPEA's words) seek to "confront[]" these visitors. *See* MD at p. 5.

However, pursuant to its 2001 policy, the MPEA forbade Albrecht and her
associates from executing their plans. *Id.* at ¶¶ 33(b) & (c). As a result, they could not
effectively communicate with Symposium visitors. During the roughly two hours they
gathered at Designated Area 2, very few visitors walked anywhere near the area. *Id.* at ¶
33(a). Subsequently, Albrecht and roughly 10 other people wearing expressive clothing
gathered inside the Grand Concourse for roughly 20 minutes. *Id.* at ¶ 33(b). Many
visitors walked by, roughly 12 visitors spoke with them, and four visitors asked for
written materials; however, Albrecht was forbidden from distributing leaflets. *Id.* at ¶
33(b). Pursuant to this Court's instructions at the end of the TRO hearing in September
2003, Albrecht gave one of her business cards to each of these four visitors; doing so did
not burden any of the MPEA's interests. *Id.* at ¶ 33(b).

**D.     The MPEA's 2004 policy.**

On June 30, 2004, the MPEA implemented a new written policy regarding

expressive activity at McCormick Place by non-licensees ("the 2004 policy"). *See* MD at

Exh. B. The MPEA admits that this change was a response to this litigation, and claims

that it is lawfully entitled to return to its 2001 policy. *See* MD at p. 17. This new policy

bans expressive activity by non-licensees at McCormick Place, with the exception of (a)

the same two inadequate outdoor areas,[3] and (b) five new but inadequate indoor areas for

single leafleters.[4]

The vast majority of McCormick Place visitors will never see or hear expressive

activity in these seven designated areas. McCormick Place events use many different

combinations of closed rooms and open halls. Based on these factors, visitors enter and

exit the facility at more than 20 separate locations, and may arrive and depart by means

of taxis, private cars, public and private buses, and trains. The facility contains more than

two million square feet of space, and visitors frequently stay close to the events they are

attending. Thus, these seven areas do not allow effective communication with visitors.

*See generally* Exh. 1 at ¶ 42.

---

[3] The MPEA renamed the two outdoor areas the "McCormick Square Zone" and
the "Lakeside Center Sidewalk Zone." Exh. 1 at ¶¶ 35-36. However, the "sidewalk" for
which the latter zone is named does not lead anywhere, so it should be called the
"Lakeside Center Sidewalk-To-Nowhere Zone."

[4] Area #1 is closed (and thus has no First Amendment relevance) for the next 18
months. Area #2 is located under the escalator at the west end of the "tenant arcade" on
Level 2.5 of the Grand Concourse. Area #3 is located immediately northwest of the
pedestrian bridge over Lake Shore Drive. Areas #4 and #5 are located at the bottom of
the ramps that connect underground Parking Lot C to the Lakeside Center.

**E.**     <u>The MPEA's application of its 2004 policy against Young.</u>

Plaintiff Quentin Young is a physician and a healthcare policy reform advocate. Exh. 1 at ¶ 7. He supports universal health care. *Id*. at ¶ 45.

In July 2004, McCormick Place hosted the annual conference of the American Physical Therapy Association ("APTA"). Exh. 1 at ¶ 43. Thousands of members attended. *Id*. at ¶¶ 43, 44. Young and likeminded persons wished to join together to express their support of universal health care to the gathered health care professionals. *Id*. at ¶ 45. They determined that an effective and non-disruptive means to do so was to distribute leaflets during the conference's opening ceremony, which featured the U.S. Surgeon General, and thus was attended by thousands of visitors. *Id*. at ¶¶ 44, 45, 51. Young sought permission to leaflet at eight fixed locations in reasonable proximity to visitors walking to the opening ceremony. *Id*. at ¶ 46. For example, he sought to leaflet adjacent to Gates 31 and 32, where buses unloaded many of the conventioneers who lodged at downtown hotels.

However, pursuant to its 2004 policy, the MPEA forbade Young and his associates from doing so. Exh. 1 at ¶ 47. As a result, Young and his associates could not effectively communicate with conference visitors. Young's associates distributed leaflets at three of the four available indoor zones (areas 3 through 5), and both of the outdoor zones. *Id*. at ¶ 49. The fourth available indoor zone (area 2) had minimal pedestrian flow at this time. Though 90% of the people who were offered leaflets took them, and though thousands of people attended the opening ceremony, Young's associates were able to distribute only 219 leaflets. *Id*. at ¶¶ 50, 51. Many people who did not pass the five approved locations did pass the eight forbidden locations. *Id*. at ¶ 52.

## ARGUMENT

"[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide open.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988), *quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Plaintiffs allege that the MPEA has violated the First Amendment by banning expressive activity by non-licensees at McCormick Place, except for inadequate areas that do not allow effective communication with facility visitors. *See* Exh. 1 at ¶¶ 2, 68. This states a claim upon which relief can be granted, so the MPEA's motion to dismiss should be denied. Part I below demonstrates the inapplicability of the MPEA's proposed cookie-cutter approach to the site-specific, individualized, contested facts that control this case. Part II shows that plaintiffs have stated a claim against the 2004 policy. Part III establishes that the MPEA's withdrawal of its 2001 policy has not mooted plaintiffs' injunctive, monetary, and declaratory claims.

When considering a motion to dismiss, the court views all facts and reasonable inferences in the light most favorable to the plaintiff. *Doherty v. City of Chicago*, 75 F.3d. 318, 322 (7th Cir. 1996). The court will grant a motion to dismiss only if the plaintiff cannot prove any set of facts entitling it to relief. *Venture Assocs. Corp. v. Zenith Data Sys., Corp.*, 987 F.2d 429, 432 (7th Cir. 1993).

## I.      This case requires adjudication of site-specific, individualized facts.

The pending motion to dismiss is not controlled by *Graff v. City of Chicago*, 9 F.3d 1309 (7th Cir. 1993) (en banc). *Cf.* MD at pp. 1-2, 10, 12. There, the Seventh Circuit affirmed the dismissal of a lawsuit challenging an ordinance limiting the size of fixed sidewalk newsstands. *Id.* at 1322-23. The court reasoned that it had "already

8

upheld a similar ordinance because of the governmental interests at stake," to wit, an ordinance prohibiting tables, signs, and literature storage at O'Hare Airport. *Id.,* discussing *International Caucus of Labor Committees v. City of Chicago* ("*ICLC*"), 816 F.2d 337 (7th Cir. 1987). The interest in both cases was "the free and orderly flow of traffic." *Id.* at 1322.

However, the court in *Graff* cautioned: "No doubt the norm is to wait until the summary judgment stage of the litigation to address the ultimate question of whether the ordinance should stand." *Id.* at 1322. *See, e.g., Air Line Pilots Assoc. v. Department of Aviation* ("*ALPA*"), 45 F.3d 1144, 1154 (7th Cir. 1995) (reversing the district court's adjudication on a motion to dismiss of facts regarding the First Amendment status of the disputed government forum). The *Graff* court then emphasized the factors in that case that allowed it to deviate from this "norm," including the absence of (a) "some distinction at the pleading stage" between the ordinance already upheld and the ordinance being challenged, (b) "disputed issues of material fact," and (c) "unique or different" governmental interests. 9 F.3d at 1323.

The instant case falls within "the norm" identified in *Graff*. Most importantly, dismissal is not required by *Chicago Acorn v. MPEA,* 150 F.3d 695, 702-703 (7th Cir. 1998). *Cf.* MD at pp. 1-2, 10-13. *Acorn* stated that Navy Pier's Gateway Park (located immediately west of that facility) is a traditional public forum. 150 F.3d at 702. This shows that McCormick Square (which is similar) is also a traditional public forum. While *Acorn* held that the pier itself is a non-public forum, *id.* at 701-02, plaintiffs allege distinctions between Navy Pier and McCormick Place that prevent a ruling on the pleadings that McCormick Place is also a non-public forum: (a) where the former is

primarily a family recreation area and only secondarily has limited meeting space, *id.* at

698, the latter exists to facilitate speech and expressive association at large gatherings;

and (b) where the former is "a discrete, outlying segment or projection of Chicago," *id.* at

702, the latter is part of the City's transportation grid.[5]

Moreover, *Acorn* commanded the MPEA to reverse course and allow leafleting in

the outdoor sidewalks and indoor mall areas on Navy Pier. 150 F.3d at 702-03. *Acorn*

implicitly acknowledged that leafleting does not burden the MPEA's economic interest in

attracting customers: while the court allowed the MPEA to protect this interest by

excluding demonstrations, *id.* at 702, it required the MPEA to allow leafleting. *Acorn*

also explained that leafleting was sufficient expressive activity on the pier, because the

facility "is so configured that everyone entering it either on foot or by car must enter

through a narrow bottleneck, appropriately named Gateway Park." *Id.* at 703. Thus,

"[b]y demonstrating in Gateway Park, persons wishing to exercise their First Amendment

right of expression can communicate with every single person who enters Navy Pier." *Id.*

This is not true at McCormick Place, where (a) different events draw visitors through

many different combinations of gates, halls, and rooms; and thus (b) the vast majority of

facility visitors will never see or hear the expressive activity taking place at the seven

designated areas. Thus, the MPEA's policies regarding Navy Pier and McCormick Place

are not "virtually identical." *Cf.* MD at p.1.

On remand, the district court made various decisions regarding the leafleting

allowed on Navy Pier. *Chicago Acorn v. MPEA*, 1999 WL 413480 (N.D. Ill. June 2,

1999). For example, the district court rejected the MPEA's proposals (a) to confine

---

[5] While dicta in *Acorn* suggest that McCormick Place is not part of the City's
transportation grid, 150 F.3d at 702, this should be resolved on an evidentiary record.

leafleters behind tables or other barriers, *id.* at *6; (b) to prohibit leafleters from approaching patrons, *id.*; (c) to limit leafleting to printed materials, as opposed to buttons and the like, *id.* at *8; and (d) to grant the MPEA unlimited discretion to move the leafleting sites, *id.* at *9. *Accord* MD at Exh. D (order of Sept. 13, 1999) at pp. 4-6.

The MPEA's other cases (*see* MD at pp. 2, 13-15) likewise do not require dismissal of this case, as set forth throughout the remainder of this brief. Rather, plaintiffs have alleged facts that distinguish those cases, require fact-based adjudication, and place this case squarely within "the norm" recognized by *Graff*.

First, facts must be adjudicated regarding the forum status of McCormick Place. Relevant factors include physical characteristics, public uses, and governmental regulations and purposes. *See, e.g., Warren v. Fairfax County*, 196 F.3d 186, 191 (4th Cir. 1999) (en banc). To the extent these areas are non-public forums (which plaintiffs dispute), the controlling "reasonableness" test requires further individualized factual determinations regarding the facility. *See, e.g., Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985) (exploring "the purpose of the forum and all the surrounding circumstances"); *United States v. Kokinda*, 497 U.S. 720, 732 (1990) (exploring "the characteristic nature and function of the particular forum involved" including any "special attributes").

Here, the site-specific, individualized factors include: the facility's use by many government, religious, professional, and other organizations as a place to gather and communicate regarding public questions; its use by many non-licensees to communicate with facility visitors; whether it is a part of the City's transportation grid; the dimensions and other physical features of McCormick Square and other disputed spaces; vehicular

11

and pedestrian flow patterns, depending on the placement of particular conventions in particular rooms; and the presence of restaurants, stores, other amenities, and commercial advertising.

Second, facts must be adjudicated regarding the challenged speech restrictions, including: whether they prevent non-licensees from effectively communicating with facility visitors; the physical features of the two outdoor and five indoor designated areas; and the flow of vehicular and pedestrian traffic past these areas.

Third, facts must be adjudicated regarding whether the challenged speech restrictions advance the MPEA's governmental interests. This is true even if the disputed venues are found to be non-public forums. *See, e.g.*, *New England Regl. Council of Carpenters v. Kinton* ("*Kinton*"), 284 F.3d 9, 20 (1st Cir. 2002) ("the reasonableness of a particular regulation is determined by a fact-intensive balancing test that takes into account such factors as the uses to which the forum typically is put, the particular risks associated with the speech activity at issue, and the proffered rationale for the restriction").

Here, the MPEA has asserted two governmental interests: first, an economic interest in attracting customers; and second, ensuring pedestrian flow and safety. *See* MD at p. 4. As applied to leafleting, the MPEA's economic interest is "unique or different," which weighs against dismissal. *See Graff*, 9 F.3d at 1323. Indeed, the MPEA's argument that it must suppress leafleting to avoid hypothetical offense to licensees is a forbidden "heckler's veto." *See* Part II(E), *infra*. The site-specific, fact-intensive issues on this point include: whether the additional fixed leafleting zones sought by plaintiffs would congest pedestrian flow; whether such zones would so offend

licensees that they would stop doing business at McCormick Place; and whether many facility visitors benefit from information offered by non-licensees. Significantly, compared to the newsstands in *Graff* and the tables in *ICLC*, leafleters occupy far less space and are far easier to move in an emergency

Finally, the MPEA's own public forum cases (*see* MD at pp. 10-15) confirm "the norm" recognized in *Graff*, *i.e.*, that public forum cases usually are not resolved on a motion to dismiss. Four of the MPEA's cases were decided by trial.[6] Three were decided after an evidentiary hearing.[7] Eight were decided on summary judgment.[8] Two more were decided by a means other than a motion to dismiss.[9] Only two (*Graff* and *ICLC*) decided the First Amendment issues at the Rule 12(b)(6) stage. Indeed, no subsequent case has followed the portion of *Graff* emphasized by the MPEA.

---

[6] *Sefick v. Gardner*, 164 F.3d 370, 371 (7th Cir. 1998); *Sefick v. United States*, 1999 WL 778588, *1 (N.D. Ill. 1999); *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1285 (10th Cir. 1999); *ISKCON v. New Jersey Sports and Exposition Auth.*, 691 F.2d 155, 158 (3rd Cir. 1982).

[7] *Chicago Acorn v. MPEA*, 1998 WL 164882, *1-*2 (N.D. Ill. 1998), *rev'd*, 150 F.3d 695 (7th Cir. 1998); *Families Achieving Independence and Respect v. Nebraska Dept. of Social Services*, 111 F.3d 1408, 1414 (8th Cir. 1997); *Henderson v. Lujan*, 964 F.2d 1179, 1181 (D.C. Cir. 1992).

[8] *ISKCON v. Lee*, 505 U.S. 505, 676-77 (1992); *Cornelius*, 473 U.S. at 796; *Perry Educ. Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 41-42 (1983); *Hotel Employees & Rest. Employees Union v. City of New York*, 311 F.3d 534, 543 (2nd Cir. 2002); *New England Regional Council of Carpenters*, 284 F.3d at 14; *ISKCON Miami v. Metropolitan Dade County*, 147 F.3d 1282, 1285 (11th Cir. 1998); *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Commn.*, 797 F.2d 552, 554 (8th Cir. 1986); *Hampton International Comm., Inc. v. Las Vegas Convention and Visitors Auth.*, 913 F. Supp. 1402, 1405 (D. Nev. 1996).

[9] *Kokinda*, 497 U.S. at 724 (criminal conviction); *Ayres v. City of Chicago*, 125 F.3d 1010, 1012 (7th Cir. 1997) (preliminary injunction).

In short, the MPEA's proposed cookie-cutter approach is the exception, and is inapplicable where (as here) alleged facts regarding the forum, the speech, the restrictions, and the governmental interests distinguish the case at bar from prior cases.

## II.     The 2004 policy violates the First Amendment.

Certain areas inside and outside McCormick Place are traditional public forums. *See* Part II(B), *infra.* The MPEA's 2004 policy fails the "time, place, and manner" test that applies to such forums. *See* Part II(C), *infra.* Even if these areas are non-public forums (which plaintiffs dispute), this policy cannot pass the "reasonableness" test. *See* Part II(D), *infra.* This entire analysis is informed by the inherently non-intrusive nature of leafleting. *See* Part II(A), *infra.* Separately, the 2004 policy is an unlawful "heckler's veto" by hypothetical licensees against non-licensees. *See* Part II(E), *infra.*

### A.     Leafleting is highly protected by the First Amendment.

"[H]anding out leaflets in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression . . . . No form of speech is entitled to greater constitutional protections." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). Thus, the Supreme Court has regularly struck down restrictions on leafleting.[10]

The special First Amendment status of leafleting rests on at least three factors. First, leafleting is one of the "most effective instruments in the dissemination of opinion."

---

[10] *See, e.g., Watchtower Bible and Tract Society v. Village of Stratton*, 536 U.S. 150 (2002) (ban on leafleting door-to-door without a permit, and without displaying the permit on demand); *McIntyre*, 514 U.S. at 347 (ban on leafleting anonymously); *United States v. Grace*, 461 U.S. 171 (1983) (ban on leafleting on sidewalk in front of the Supreme Court); *Talley v. California*, 362 U.S. 60, 64 (1960) (ban on anonymous leafleting); *Martin v. City of Struthers*, 319 U.S. 141, 145 (1943) (ban on leafleting door-to-door); *Jamison v. Texas*, 318 U.S. 413 (1943) (ban on leafleting in public places); *Schneider v. State of New Jersey*, 308 U.S. 147, 164 (1939) (ban on leafleting in public places); *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (ban on leafleting without a permit).

14

*Schneider v. State of New Jersey*, 308 U.S. 147, 164 (1939). *See also Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("pamphlets and leaflets . . . have been historic weapons in the defense of liberty, as pamphlets of Thomas Paine and others in our history abundantly attest"). Second, leafleting "is essential to the poorly financed causes of little people." *Watchtower Bible and Tract Society v. Village of Stratton*, 536 U.S. 150, 163 (2002), *quoting Martin v. City of Struthers*, 319 U.S. 141, 144-46 (1943).

Third, leafleting is inherently non-intrusive and poses few if any safety or traffic flow threats. "[I]t is difficult to point to any problems intrinsic to the act of leafleting that would make it naturally incompatible with a large, multipurpose forum." *ISKCON v. Lee*, 505 U.S. 672, 696 (1992) (O'Connor, J., concurring). *Accord Kokinda*, 497 U.S. at 734 (1990) ("One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand."); *NTEU v. King*, 798 F. Supp. 890, 789 (D.D.C. 1992) ("passing out leaflets may be one of the least disruptive forms of expression").

## B. The publicly accessible areas of McCormick Place are traditional public forums.

### 1. McCormick Square.

McCormick Square is a traditional public forum. First, it is a combination of sidewalks and parks, two archetypical kinds of traditional public forums. *See United States v. Grace*, 461 U.S. 171, 179 (1983) (holding that sidewalks and parks are generally traditional public forums); *Warren*, 196 F.3d 186 at 190-91 (holding that a particular combination of sidewalks and parks was a traditional public forum, and explaining that "a court can generally treat a street, sidewalk, or park as a traditional public forum without making a particularized inquiry"). Other physical features of McCormick Square support

this conclusion: it is a large, unobstructed, publicly accessible, outdoor space; it sits at the symbolic "front door" of McCormick Place (*i.e.*, Gate 4); it contains numerous benches and aesthetically pleasing sculptures, used and designed as places for the public to stop, gather, and relax; and there are no signs or other indicators that access is limited.

Second, McCormick Square is "compatible with the wide measure of expressive conduct characterizing public fora." *Warren*, 196 F.3d at 195. For example, its eastern edge (the sidewalk across the driveway from Gate 4) is compatible with people holding signs. Third, *Acorn* stated that Navy Pier's Gateway Park is a traditional public forum. 150 F.3d at 702. Gateway Park and McCormick Square share all of the characteristics listed above. Thus, McCormick Square is also a traditional public forum.

The outdoor venue cases cited by the MPEA (*see* MD at pp. 10-15) are easily distinguished. Boston's "Fish Pier" is used primarily to process fish, with only a small handful of other commercial uses; its only entry has an iron fence and gate, a security booth, and signs requiring authorization to enter; there are no pedestrian sidewalks; and the high volume of truck traffic endangers pedestrian safety. *Kinton*, 284 F.3d at 15, 22, 24. Denver's "Galeria" functions solely as the only entry and lobby of a performing arts complex; it can become "extremely crowded, making it difficult for [] patrons to move about freely"; it contains only three commercial establishments; and it is not part of the city's transportation grid. *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1284, 1287, 1291 (10th Cir. 1999). The Robertson Plaza at New York's Lincoln Center "was created as an enclave for the cultural arts," and the restriction of the venue to artistic expression thus "serves an important public purpose in promoting the arts and establishing a community space for the public to experience artistic performances."

16

*Hotel Employees and Rest. Employees Union v. City of New York* ("*H.E.R.E. Union*"),

311 F.3d 534, 554 (2nd Cir. 2002). The sidewalks leading to the Las Vegas Convention

Center "were created solely to manage the heavy pedestrian traffic." *Hampton Intl.*

*Communications, Inc. v. Las Vegas Convention and Visitors Auth.*, 913 F. Supp. 1402,

1410 (D. Nev. 1996).

Finally, only four Justices in *Kokinda* viewed the disputed Post Office sidewalk as

a non-public forum. *Compare* 497 U.S. at 727 (O'Connor, J., plurality); *with id.* at 738

(Kennedy, J., concurring); *and id.* at 742-43 (Brennan, J., dissenting). In any event, that

sidewalk (unlike the ones in McCormick Square) "was constructed solely to provide for

the passage of individuals engaged in postal business," *i.e.*, passage from the post office

to its adjacent parking lot. *Id.* at 727.

### 2. The publicly accessible interior areas.

The publicly accessible interior areas of McCormick Place are also traditional

public forums (*e.g.*, the Grand Concourse). These areas collectively serve as a

thoroughfare, mall and gathering place for members of the public, including people with

no connection to facility events. They allow a high volume of pedestrian flow, in many

areas being 50 feet wide. They contain many restaurants and stores, all of which display

commercial advertisements. Their beautiful fountains and seating areas are used and

plainly designed as places for the public to stop, gather, and relax. People there

commonly wear clothes that bear a wide variety of messages.

While *Acorn* held that certain areas at Navy Pier are non-public forums, 150 F.3d

at 701-02, plaintiffs have pled critical distinctions between Navy Pier and McCormick

Place. First, where the former primarily serves "recreational" and "amusement"

17

functions and only secondarily serves as a meeting facility, *see id.* at 698, the latter exists

primarily to facilitate speech and expressive association at large gatherings. *See*

*Cornelius*, 473 U.S. at 800 (one factor that distinguishes traditional public forums is that

"a principle purpose" is "the free exchange of ideas"). Second, where Navy Pier is "a

discrete, outlying segment or projection of Chicago," *id.* at 702, McCormick Place is part

of the City's transportation infrastructure. For example, it can be used to walk from

Martin Luther King Drive to the lakefront. Also, there is a Metra stop accessible only

through the Grand Concourse, and a CTA bus stop in the enclosed area outside Gate 3.

The other indoor venue cases cited by the MPEA (*see* MD at pp. 13-15) are

readily distinguished. The lobby of the Dirksen Federal Courthouse is used solely as an

access route from the streets to the court rooms; it requires solemnity to help ensure that

jurors and witnesses take their responsibilities seriously; and it is not used by the public

as a place to stop, gather, and relax. *See Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir.

1998). The interior of the Meadowlands sports complex is not designed or used for any

form of expressive activity. *ISKCON v. New Jersey Sports and Exposition Auth.*, 691

F.2d 155, 158, 161 (3rd Cir. 1982). In the MPEA's three other cases, the plaintiff did not

assert that the venue was a traditional public forum. *Families Achieving Independence*

*and Respect v. Nebraska Dept. of Social Services*, 111 F.3d 1408, 1419 (8th Cir. 1997);

*Grossbaum v. Indianapolis-Marion County*, 100 F.3d 1287, 1297 (7th Cir. 1996); *Seffick*

*v. United States*, 1999 WL 778588, *9 (N.D. Ill. 1999).

### 3. <u>Areas outside the facility gates.</u>

The areas immediately outside McCormick Place's various gates are also

traditional public forums (*e.g.*, the taxi drop-off areas outside gate 4, and the bus drop-off

areas outside gate 31). These areas are located on sidewalks, which ordinarily are traditional public forums. *See Warren*, 196 F.3d at 191. Moreover, they are publicly accessible, and compatible with leafleting.

### C. The MPEA's 2004 policy fails the "time, place, and manner" test.

Restrictions on expressive activity in a traditional public forum are analyzed under the "time, place, and manner" test. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The MPEA's 2004 policy fails this test, because (1) it is not "narrowly tailored to a serve a significant government interest," and (2) it does not "leave open ample alternative channels for communicating the information." *Id.*

### 1. The 2004 policy is not narrowly tailored.

A regulation is only narrowly tailored "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). It is not narrowly tailored if it "burden[s] substantially *more speech than is necessary* to further the government's legitimate interests." *Ward*, 491 U.S. at 799. The government bears the burden of coming forward with "objective evidence," as opposed to "speculation," that the restriction will actually advance the government's interests. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1038-39 (7th Cir. 2002).

Here, the additional expressive activity for non-licensees sought by plaintiffs would not burden the MPEA's asserted interests in (a) attracting and retaining paying customers, and (b) ensuring pedestrian traffic flow, safety, and the like. *See* MD at p. 4.

### a. The MPEA's economic interests.

The additional expressive activity sought by plaintiffs will not put the MPEA at a competitive disadvantage in the convention market. First, the organizations that lease

space at McCormick Place must consider many critical factors when selecting a convention venue, including: the price of the convention space; the price of surrounding hotels and restaurants; and surrounding tourist attractions. These organizations apparently are not deterred from choosing the McCormick Place by the current level of expressive activity by non-licensees, which includes (in addition to the seven fixed zones) expressive clothing throughout the publicly accessible interior areas of the facility. The MPEA has yet to proffer evidence that these same organizations would be deterred by the additional expressive activity sought here by plaintiffs. In this regard, *Acorn* implicitly distinguishes demonstrations (which might effect the MPEA's ability to attract customers) from leafleting (which probably won't). 150 F.3d at 702. In any event, this factual dispute is not ripe for resolution on a motion to dismiss.

Second, some convention centers allow expressive activity by non-licensees comparable to what plaintiffs seek here. For example, the grounds of the Kentucky Fair and Exposition Center (the nation's eighth largest convention center by square feet of exhibit space) contains 31 outdoor and 12 indoor leafleting areas, located in reasonable proximity to 12 facility entrances. *See* 303 Ky. Admin. Regs. 1:080.

Also, eight of the nation's ten largest convention centers are publicly owned, as are many other large convention centers. At all of these facilities, the First Amendment (as here) ensures effective communication by non-licensees with facility visitors.

Moreover, many government-owned convention centers are regulated by state constitution that are *more* protective of speech than the U.S. Constitution. *See, e.g., Carreras v. City of Anaheim*, 768 F.2d 1039, 1045, 1050 (9th Cir. 1985) (under the California Constitution, striking down a ban on in-person solicitation on the sidewalks

20

immediately outside the government-owned Anaheim Convention Center); *ISKCON v. City of Los Angeles*, 2001 WL 1804795, *5-*6 (C.D. Cal. 2001) (under the California Constitution, striking down a ban on in-person solicitation inside the LAX airport). Furthermore, many privately-owned convention centers are regulated by state constitutions that protect expressive activity on private property. *See, e.g., Ferner v. Toledo-Lucas County Convention Center*, 610 N.E.2d 1158 (Ohio Ct. App. 1992) (under the Ohio Constitution, striking down a ban on ballot signature solicitation inside the lobby of a privately-owned convention center). *See also Robins v. Pruneyard Shopping Center*, 592 P.2d 341 (Cal. 1979), *aff'd*, 447 U.S. 74 (1980) (holding that the California Constitution protects free speech on private property).

Third, many McCormick Place visitors are interested in the information and opinions provided by non-licensees. For example, several visitors to the EPC Symposium spoke to Albrecht and asked her for written materials. Moreover, many non-licensees' messages are not critical of licensees, but simply provide relevant information to an interested audience. For example, Young's message did not criticize the APTA, but rather addressed a health policy issue to a gathering of health professionals.

b. **The MPEA's pedestrian flow and safety interests.**

The expressive activity sought by plaintiffs would not burden the MPEA's interests in pedestrian flow and safety. Leafleting is highly non-intrusive. *See* Part II(A), *supra*. The areas at McCormick Place where plaintiffs seek additional fixed leafleting zones allow ample pedestrian flow. For example, the Lakeside Center lobby measures 205 feet by 215 feet, and the open area of Level 2.5 of the Grand Concourse measures 50 feet by 231 feet. Leafleters in these areas would occupy no more space than any other

21

person (a) walking or standing, (b) engaging in one-on-one conversation, (c) wearing expressive clothing, or (d) handing out a business card. Indeed, when approved by licensees, the MPEA allows the distribution of leaflets inside McCormick Place, *e.g.*, at the bottom of the escalator in the lobby of the Grand Concourse. The facility was designed to smoothly accommodate the flow of tens of thousands of visitors, so the addition of more fixed leafleting zones should not burden pedestrian flow. *See Ayres*, 125 F.3d at 1013-14 ("The incremental contribution to congestion that five peddlers can make in a sea of hundreds of thousands of festival-goers is very small," and the harm to the government caused by such peddling is "trivial").

The MPEA suggests that the horrifying events of September 11 support the challenged speech restrictions. *See* MD at pp. 4, 15. However, in a recent case involving free speech on Chicago's federal plaza, the court wrote: "[O]ur Constitution was not among the list of endless casualties suffered by our country on September 11, 2001. . . . It is critical that courts again heighten their overall vigilance and willingness to uphold our constitutional freedoms during this turbulent period of our history." *ACLU v. GSA*, 235 F. Supp. 2d 816, 817 (N.D. Ill. 2002).

## 2.    **The alternative communication channels are inadequate.**

Speech restrictions in a traditional public forum must leave open "ample alternative channels" for communication. *Ward*, 491 U.S. at 791. Moreover, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. Town of Irvington*, 308 U.S. 147, 163 (1939). Also, "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Weinberg*, 310 F.3d at 1042.

22

Here, the seven areas designated by the 2004 policy do not comprise "ample alternative channels" for communication. McCormick Place has more than 20 separate entrances, designed variously for visitors arriving by cars, taxis, public and private buses, and trains; more than two million square feet of exhibit space; dozens of restaurants and stores; and many different publicly accessible lobbies, concourses, and corridors. Different events use different combinations of entrances, closed rooms, and public halls – and thus draw visitors to different portions of the facility. As the designated areas for non-licensees are currently configured, the vast majority of visitors at the vast majority of events will not see or hear the messages expressed by non-licensees. Thus, for example, when Young and his associates used the designated areas, they could communicate with only a small faction of their intended audience.

Moreover, the public sidewalks adjacent to MPEA property are not "ample alternative channels." First, these sidewalks are hundreds of feet away from the facility buildings. Second, many facility visitors never come anywhere near these sidewalks, but rather alight from cars or public transportation into interior areas of the facility. In this respect, McCormick Place is unlike the venues where courts have upheld speech restrictions. *See Seffick*, 164 F.3d at 373 (at the Dirksen Courthouse, "the streets outside are open"); *H.E.R.E. Union*, 311 F.3d at 556 ("neighboring Damrosch and Dante Parks, and the public sidewalks surrounding Lincoln Center, provide ample alternative venues for groups . . . to voice their views to Lincoln Center's patrons"); *Hawkins*, 170 F.3d at 1284 ("on busy occasions, as many as 40 to 50 percent of the total patrons enter the [Denver] Galleria from the 14[th] Street entrance," which is "a public right of way"); *Families Achieving Independence and Respect*, 111 F.3d at 1422 (plaintiff "had access to

the public sidewalks outside" the government welfare office). *See also Acorn*, 150 F.3d at 703 (when upholding a ban on demonstrations on Navy Pier, explaining that "everyone entering it either on foot or by car must enter through a narrow bottleneck, appropriately named Gateway Park," which allows demonstrations).

**D.      The MPEA's 2004 policy fails the "reasonableness" test.**

Even if the disputed areas of McCormick Place are non-public forums (which plaintiffs dispute), the MPEA's 2004 policy still cannot pass the applicable "reasonableness" test. In her controlling opinion in *ISKCON v. Lee*, Justice O'Connor used this test to strike down leafleting restrictions in an airport. 505 U.S. at 690. Justice O'Connor explained:

> In this case, the "special attributes" and "surrounding circumstances" of the airports operated by the Port Authority are determinative. Not only has the Port Authority chosen *not* to limit access to the airports under its control, it has created a huge complex open to travelers and nontravelers alike. The airports house restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, post offices, banks, telegraph offices, clothing shops, drug stores, food stores, nurseries, barber shops, currency exchanges, art exhibits, commercial advertising displays, bookstores, newsstands, dental offices, and private clubs.

*Id.* at 688. Significantly, Justice O'Connor held that "[t]he reasonableness inquiry" turned not on whether the ban on leafleting was consistent with air travel, but whether the ban was "reasonably related to maintaining the multipurpose environment that the Port Authority has deliberately created." *Id.* at 689.[11]

---

[11] In dicta, Justice O'Connor wrote approvingly of the JFK airport's restriction of Krishna "sankirtan" to "a relatively uncongested part of the airport terminals." 505 U.S. at 692. "Sankirtan" means "to distribute or sell religious literature and to solicit donations." *Heffron v. ISKCON*, 452 U.S. 640, 645 (1981). Justice O'Connor did not indicate whether the First Amendment would allow the government to restrict leafleting alone (as opposed to with solicitation) to these same areas. *Cf.* MD at p. 11.

As Judge Posner explained in *Acorn*: "What is particularly interesting about Justice O'Connor's swing opinion [in *ISKCON v. Lee*] is that it blurs the line between the public and nonpublic forum, suggesting a sliding-scale approach . . . in which the benefits and costs of free speech are balanced in particular settings." 150 F.3d at 702. *See also ALPA*, 45 F.3d at 1159 (the reasonableness inquiry "require[s] a determination of whether the proposed conduct would 'actually interfere' with the forum's stated purpose"). Applying this "reasonableness" standard, *Acorn* struck down the MPEA's leafleting restriction at Navy Pier. 150 F.3d at 702-04. *See also Board of Airport Commrs. of Los Angeles v. Jews for Jesus*, 482 U.S. 569, 575 (1987) (unanimously striking down a ban on "all First Amendment activity" at an airport).

Here, the 2004 policy is not "reasonable," because the "benefits" of allowing the proposed expressive activity outweigh the "costs" in the "particular settings" proposed by plaintiffs. *See Acorn*, 150 F.3d at 703. To summarize the points discussed above (*see* pp. 19-24, *supra*): Non-licensees would obtain the benefit of effective communication with facility visitors, and many visitors would obtain the benefit of information and opinion of interest to them. On the other hand, the MPEA has yet to produce evidence that additional expressive activity by non-licensees would cause licensees to take their business elsewhere, even though (a) these customers tolerate the expressive activities presently authorized by the MPEA, and (b) other facilities provide the kinds of expressive activity sought by plaintiffs. Indeed, most large convention centers are publicly-owned, and are thus required by the First Amendment to allow effective communication with facility visitors. Also, additional leafleting will not burden the MPEA's traffic flow interests. Leafleters take up no more space than other persons who are walking, talking,

standing, or wearing expressive clothing. Indeed, the MPEA allows licensee-approved

leafleting in areas of the facility with a high volume of pedestrian flow.

Moreover, the MPEA's 2004 policy is not "reasonably related to maintaining the

multipurpose environment" at McCormick Place. *See ISKCON*, 505 U.S. at 689

(O'Connor, J., concurring). This multipurpose environment includes restaurants, coffee

shops, cocktail lounges, business centers, gift shops, shoe shine parlors, ATM machines,

coat checks, mail boxes, scores of art exhibits, gorgeous water fountains, internet access

kiosks, and commercial advertising displays – all open to the public. The expressive

activity sought by plaintiffs would not harm this multipurpose environment.

Finally, the reasonableness of the MPEA's 2004 policy is not controlled by the

MPEA's cases involving expressive activities more disruptive than the leafleting sought

here, to wit: (a) 25 people picketing and leafleting "throughout" a lobby, *Hawkins*, 170

F.3d at 1285; (b) in-person solicitation and/or sale of literature, *Kokinda*, 497 U.S. at 737;

*ISKCON Miami, Inc.*, 147 F.3d at 1287[12]; *New Jersey Sports and Exposition Auth.*, 691

F.2d at 158[13]; and (c) the display of large, stationary objects for a period of days or

longer, *Seffick*, 164 F.3d at 373; *Grossbaum*, 100 F.3d at 1290; *Seffick*, 1999 WL 778588,

*2. Also, this case is not controlled by the MPEA's cases involving unusual forums

where (unlike here) leafleting burdened governmental interests. *See Kinton*, 284 F.3d at

24 (a commercial fishing pier with truck traffic, no sidewalks, and thus pedestrian safety

---

[12] This case also upheld the restriction of leafleting at Miami airport to eight zones
"adjacent to the flow of passenger traffic," in the absence of evidence that these zones
were "insufficient." 147 F.3d at 1290. McCormick Place's four presently-open interior
zones are insufficient, as explained above.

[13] While the disputed policy applied to in-person solicitation and leafleting, 691
F.2d at 158, plaintiff ISKCON did "not wish to distribute literature without
simultaneously soliciting money." *Id.* at 161 n.3.

hazards); *Families Achieving Independence and Respect*, 111 F.3d at 1411-12 & n.3, 1421 (a small government lobby with a high-volume of foot traffic, and a captive audience of vulnerable, low-income clients who had to visit the lobby to obtain various government benefits).

      E.    **The MPEA's 2004 policy comprises a "heckler's veto."**

     The First Amendment prohibits a "heckler's veto"; that is, the government cannot suppress speech because it offends other people. *See, e.g., Gregory v. Chicago*, 394 U.S. 111 (1969) (striking down the arrest of a demonstrator because onlookers became unruly). Federal courts have struck down as "heckler's vetoes" a variety of speech regulations involving public property. *See e.g., Church of American Knights of KKK v. City of Gary*, 334 F.3d 676, 680-81 (7th Cir. 2003) (requirement that demonstrators pay the government the expense of protecting the demonstrators from hecklers); *Acorn*, 150 F.3d at 701 (policy of charging different fees from different organizations to rent meeting rooms, based on the popularity of the organization).

     Here, the MPEA openly admits that it is restricting speech by non-licensees to prevent a hypothetical negative reaction by licensees. *See, e.g.,* MD at p. 4. This is a forbidden "heckler's veto." *See Kinton*, 284 F.3d at 24 (stating that the government's interest in excluding leafleters from a non-public forum "because they are undesirable to [the government's] tenants" is "of uncertain force in the First Amendment calculus"). Many of the MPEA's licensees are themselves units of government; it is doubly unlawful when the MPEA suppresses speech to prevent offense to these licensees.

     Nor may the government silence counter-speakers. If one group is engaged in expressive activity, another group may engage in responsive, non-disruptive expressive

27

activity in reasonable proximity to the former. *See, e.g., Mahoney v. Babbitt*, 105 F.3d

1452 (D.C. Cir. 1997) (protecting a demonstration adjacent to a presidential procession);

*Glasson v. City of Louisville*, 518 F.2d 899, 901-02, 905-06 (6th Cir. 1975) (same); *Bay

Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990) (striking down a 75-yard

buffer zone around the audience pier during an annual parade of naval ships).

Finally, the MPEA cannot prevail by arguing that its 2004 policy is aimed not at

the content of non-licensees' expressive activity, but rather at the "secondary effects" of

such activity, *i.e.*, the loss of paying licensees who wish to avoid this activity. *Cf. City of

Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986) (upholding zoning restrictions

on adult movie theaters, due to the "secondary effects" of such theaters, such as crime).

The Supreme Court specifically rejected this argument in *Forsyth County v. The

Nationalist Movement*, 505 U.S. 123 (1992), which struck down a city ordinance that

allowed parade permit fees to vary depending upon the estimated cost of maintaining

public order. The city there argued "that the ordinance [was] content neutral because it

[was] aimed only at a secondary effect – the cost of maintaining public order." *Id.* at 134.

The Court disagreed, holding that "[l]istener's reaction to speech is not a content-neutral

basis for regulation." *Id.*

**III.    Plaintiffs' challenge to the 2001 policy is not moot.**

The MPEA's unilateral withdrawal of its 2001 policy did not moot plaintiffs'

injunctive, damages, and declaratory claims against that policy. *Cf.* MD at pp. 2, 15-17.

**A.    Plaintiffs' injunctive claims.**

"In general, 'voluntary cessation of allegedly illegal conduct does not' render a

case moot." *Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994), *quoting United States*

*v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). Moreover, "the burden of proving mootness – which is on the defendant – is a heavy one." *Id.* While voluntary cessation by government officials merits "more solicitude" than by private parties, *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988), it does not moot a controversy where there is "evidence creating a reasonable expectation that the [government] will reenact the [challenged policy] or one substantially similar." *Federation of Advertising Industry Representatives, Inc. v. City of Chicago* ("*FAIR*"), 326 F.3d 924, 930 (7th Cir. 2003). Thus, courts in various circumstances have held that the government's withdrawal of the challenged policy did not moot the case. *See, e.g., Seffick*, 164 F.3d at 372 (policy change not implemented by statute or regulation); *Kikumura*, 28 F.3d at 597 (challenged policy "ebbed and flowed throughout the course of this litigation").

Here, the face of the MPEA's motion to dismiss contains "evidence creating a reasonable expectation" that the MPEA will reenact the 2001 policy or another that flatly bans all interior leafleting. *See FAIR*, 326 F.3d at 930. First, the MPEA claims that it is lawfully entitled to do so. *See* MD at pp. 9, 13, 17. Second, the MPEA has taken the position that any leafleting inside McCormick Place will burden its interests. *See id.* at p. 4 ("The Authority's judgment *is* that allowing such forms of expression [including "leafleting"] in the public areas of McCormick Place would be disruptive and unwelcome to the Authority's customers, and would have a significant negative impact on the Authority's ability to attract and retain customers") (emphasis added). Third, the MPEA admits that it withdrew the 2001 policy *"to avoid the expense of further litigation and potential liability for attorney fees," id.* at p. 17 – a motive that will cease to exist if plaintiffs' injunctive claim is dismissed as moot.

Plaintiffs expect through discovery to develop additional evidence creating a reasonable expectation that the MPEA will reenact the 2001 policy. Adjudication of the mootness issue should wait until the completion of this discovery.

**B.      Albrecht's damages and declaratory claims.**

Albrecht has pending claims for damages and declaratory relief regarding the MPEA's application of its 2001 policy to restrict her expressive activities in September 2003. *See* Exh. 1 at pp. 16-17.[14] These claims are not moot. "[S]o long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Srvcs.*, 532 U.S. 598, 608-09 (2001). Moreover, "[w]hen a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive." *Crue v. Aiken*, 370 F.3d 668, 677-78 (7th Cir. 2004).

---

[14] Young has damages and declaratory claims arising from the 2004 policy.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court deny the

MPEA's motion to dismiss in its entirety.

DATED:  August 30, 2004

Respectfully submitted:

One of plaintiffs' attorneys

HARVEY GROSSMAN
ADAM SCHWARTZ
CONNIE CHUNG
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
(312) 201-9740

WILLIAM J. GIBBONS
ERIN SHAW
DAVID CAMPBELL
Latham & Watkins
233 S. Wacker Drive, Suite 5800
Chicago, Illinois 60606
(312) 876-7700

31

# See Case File For Exhibits